UNITED STATES of America, Appellee,

v.

Nick DiPAOLO, Edward Weather, and Paul Snyder (a/k/a "Dusty"), Defendants-Appellants.

Nos. 1268, 1269, 1261 Dockets 86–1024 to 86–1026.

United States Court of Appeals, Second Circuit.

Argued May 23, 1986.

Decided Oct. 30, 1986.

Ronald S. Carlisi, Rochester, N.Y., for defendant-appellant Nick DiPaolo.

Charles A. Schiano, P.C., Rochester, N.Y., for defendant-appellant Edward Weather.

Charles T. Noce, Rochester, N.Y., for defendant-appellant Paul Snyder.

Jonathan W. Feldman, Asst. U.S. Atty., Rochester, N.Y. (Salvatore R. Martoche, U.S. Atty. for the W.D.N.Y., Rochester, N.Y., of counsel), for appellee.

Before MANSFIELD, OAKES and MES-KILL, Circuit Judges.

OAKES, Circuit Judge:

While not contesting the sufficiency of the evidence, Nick DiPaolo, Edward Weather, and Paul Snyder all appeal their convictions for conspiracy to intimidate witnesses and prevent communication to law enforcement officers of information relating to a Postal Service robbery in violation of 18 U.S.C. § 371 (1982), and the substantive crimes of using intimidation and physical

force against Lucille Barone and against her sister-in-law, Joanne Barone, in violation of 18 U.S.C. § 1512 (1982). DiPaolo also appeals his conviction for criminal contempt of court under 18 U.S.C. § 401 (1982). Appellants were convicted before the United States District Court for the Western District of New York, Thomas C. Platt, Jr., Judge, sitting by designation.

Among other arguments, appellants claim that the trial judge acted improperly by unduly limiting their cross-examination of Joanne Barone as to her drinking problem and psychiatric history and refusing to allow extrinsic proof of prior bad acts. They also claim that the conduct of the trial judge through questioning witnesses and criticizing counsel unduly prejudiced the jury and prevented a fair trial, and that the assaults upon Joanne Barone were irrelevant to the attempt to cover up the post office robbery. In addition, they argue that an *in limine* ruling concerning impeachment of one of defendant Snyder's alibi witnesses by use of a prior conviction was erroneous and the Government's summation reference to the alibi witness's not testifying was prejudicial. And they contend that defendant Weather's motion for severance pursuant to Fed.R.Crim.P. 14 should have been granted and his membership in the Hell's Angels motorcycle gang should not have been admitted as evidence of intimidation.

Appellants also challenge their sentencing. Defendants Weather and Snyder were sentenced to five years' imprisonment on the conspiracy count and ten years' imprisonment on three substantive counts, with the sentences on the conspiracy and two of the substantive counts to run concurrent to each other but consecutive to the sentence on the substantive count involving intimidation of Lucille Barone, thus amounting to twenty years' imprisonment. Defendant DiPaolo was sentenced to five years' imprisonment on the conspiracy count, five years on the substantive count involving Lucille Barone, and ten years on each of the two counts involving Joanne Barone, with the latter two sentences running concurrently but consecutively to the

sentences on the first two counts. DiPaolo was also sentenced to ten years' imprisonment for criminal contempt of court, to be served consecutively, in connection with the acts underlying the third and fourth counts above. In addition, each defendant was fined $25,000 with respect to the substantive count involving Lucille Barone. Appellants argue that the sentencing was excessive and that the court erred by imposing consecutive sentences for crimes arising out of the same transaction.

The Government's proof at trial amply showed that on April 19, 1984, a United States Postal Service contract carrier was hijacked and robbed of some $221,000 in blank American Express travelers checks. Soon thereafter a federal grand jury began hearing evidence regarding the robbery. An investigation into the robbery was coordinated by the United States Postal Inspection Service with the assistance of the Rochester Police Department and the New York State Police. In the winter of 1984 Rochester police officers Donald Agnello and James MacNamara were assigned to the 11 p.m. to 7 a.m. shift on adjacent beats in the northwest or "Lake" section of the City of Rochester. They met for meals at the Princess Restaurant, where Lucille Barone was a waitress on a similar shift. At first her conversations with the officers were general, but as their friendship developed, she discussed having problems with her boyfriend, appellant DiPaolo. In late February 1985, she indicated to the officers that she possessed information regarding the postal truck robbery and involving DiPaolo and DiPaolo's close friend, Edward Weather.

It was during this period that DiPaolo, Weather, and Snyder began accusing Lucille Barone of providing information to the police regarding the postal truck robbery. While in a bar, D.J.'s Lounge, in mid-or late February, Ms. Barone was approached by Weather, Snyder, and DiPaolo. DiPaolo told her they had information that she was a police informant and that she could "get into big trouble by speaking to the police so much." Weather, talking to DiPaolo, not

to Lucille Barone directly, said to "tell her she could get seriously hurt." She told them she was not supplying information to the police and pretended by laughing and being "cocky" to get them to stop. At this point Snyder said, "Tell her that it's not a joke."

After this meeting at D.J.'s Lounge, Lucille Barone stressed to DiPaolo that she was not an informant. Then one day, either at the end of February or in the beginning of March, DiPaolo and Weather came to her house around midafternoon in Weather's brown pickup truck. Weather sat at her kitchen table and DiPaolo said they had to talk about her being an informant. Weather had some folded papers that he pretended were a "transcript." They told Ms. Barone that she could get "seriously hurt" if she were an informant, and that the papers were proof that she was an informant. She started laughing and taunted them to show her her name on the "transcript." Weather refused and told DiPaolo to "tell her she could get seriously hurt." DiPaolo said he had tried to protect her but that he would have to stand out of the way because there was nothing he could do. He told her that she could get her legs broken and get seriously hurt, and that Weather "and the Hell's Angels would not really appreciate [her] going around blabbing to the police any of the information." Her laughing did not help matters but rather agitated them to the point where DiPaolo slapped her on the back of the head and said, "We're not kidding. This is no joke. You have to stop thinking we are fooling around."

Meanwhile, Ms. Barone was continuing to work at the Princess and talking to the two officers. After learning that Ms. Barone had information regarding the postal truck robbery, Officer Agnello began encouraging her to meet with Postal Inspectors to discuss the robbery. Ms. Barone often expressed concerns to Officer Agnello about her safety and the safety of her children. At times Weather and DiPaolo would see her talking to the officers as they drove by the restaurant. She would attempt to explain that her conversations were innocent but DiPaolo would frequently tell her that Weather and he did not appreciate her talking to the police.

Ms. Barone testified that sometime in late February or early March, appellant Snyder knocked at her door. When she saw it was him she tried to shut the door, but Snyder pushed it open, hitting her in the side of the face. He began yelling at her that "they had told [her] a hundred times not to talk to the police any more and that they weren't joking." He backed her up forcefully into the living room, yelling at her, saying that she was a cop lover and that she obviously did not take their threats very seriously. He then pushed her on the couch and raped her, after which he said that "next time he wouldn't be so nice." As a result of the assault and rape she had a red mark on her neck. She did not tell anyone of the assault because she was afraid she "would probably end up dead." She did tell Officer Agnello, however, that she had a "close encounter" with "Dusty," i.e., Snyder, but did not tell him about the actual rape. A few days after the incident DiPaolo told her that he and Weather had put Dusty on an airplane to Florida.

Subsequently, DiPaolo again insisted to Ms. Barone that he was going out of his way to try to protect her but there would be absolutely nothing he could do for her if she persisted in talking to the officers. He told her that he would not be able to stop the Hell's Angels from harming her, and that Officer Agnello and his family might also be harmed. Ms. Barone testified without objection that she knew Weather to be a member of the Hell's Angels, both from the fact that he had told her that he was and that he regularly wore a Hell's Angel patch on the back of his jacket. She said that she was fearful of the Hell's Angels. She also testified that appellants DiPaolo and Snyder associated with members of the Hell's Angels, although they themselves were not members.

When Ms. Barone next saw the officers they again encouraged her to speak with

federal Postal Inspectors and accept federal protection. On the night of March 21, 1985, Officer Agnello met with Lucille Barone and told her he had made arrangements for her to meet with the Postal Inspectors. Ms. Barone told Agnello she had to go home because her children were still in the house and DiPaolo had called her that night to tell her "he would be at the house waiting for [her] when she got off work." Ms. Barone returned home and after DiPaolo left she went with Agnello to speak with the Postal Inspectors. She and her children were put under protective custody on March 22, 1985. Weather and Di-Paolo were placed under arrest that same morning.

Following Lucille Barone's being taken into protective custody, on the afternoon of April 15, Joanne Barone, the sister-in-law of Lucille, was in her front yard with her two small children when a car pulled in front of the house. The driver remained in the car and DiPaolo came out of the passenger side of the vehicle carrying a screwdriver. DiPaolo struck her several times on the face with the handle of the screwdriver. As he was beating her, he told her that she should tell her husband, John Barone, and his brothers "to keep out of Lucille's business." He further told her that if she told anybody about the incident he would return and hurt her children. Photographs of Joanne's face after the assault were introduced in evidence.

As a result of the assault of April 15 the Government moved for an order revoking DiPaolo's bail on the basis that it violated a condition of his release that he not contact Lucille Barone or members of her family. An arrest warrant was issued and DiPaolo was arrested on April 19, 1985, with the hearing on the Government's application to revoke the bail scheduled for April 25. On April 21, 1985, however, Joanne Barone was again assaulted while sitting on the porch with her two children. An unknown male came onto her porch and told her "not to testify against Nick DiPaolo" and struck her in the face. Thereafter, she and her children were also taken into protective custody. At the conclusion of the bail revocation hearing on April 25, DiPaolo was detained without bail and a magistrate ordered the United States Attorney to prepare an order to show cause citing DiPaolo for criminal contempt pursuant to 18 U.S.C. § 401 (1982). The criminal contempt charge was joined for trial with the witness intimidation charges contained in the earlier indictment and was submitted separately to the jury after they had returned a verdict with respect to the charges in the indictment.

## DISCUSSION

### A. *Cross-examination of Joanne Barone*

Appellants claim that their cross-examinations of Joanne Barone were overly restricted because the trial court, after an in camera hearing, declined to permit them to cross-examine her regarding her use of alcohol. She testified in camera that although she has had a drinking problem for two years, there were long periods of time in which she did not drink, including the day Nick DiPaolo assaulted her. Indeed, she testified that she had consumed alcohol on only one occasion between January 1985 and April 15, and that was in the middle of March. After she was beaten by DiPaolo, however, she started drinking again on April 19 and after the second assault experienced a relapse, finally seeking professional help in June 1985. Joanne Barone further testified that she was not under the influence of alcohol at the time she was testifying and in fact had not consumed any alcohol for five months. The court ruled that counsel would not be permitted to impeach the witness solely on the basis of having a drinking problem.

 It is, of course, within the proper scope of cross-examination to determine whether a witness was under the influence of drugs or narcotics or alcohol at the time of observation of events in dispute, *United States v. Fowler*, 465 F.2d 664 (D.C.Cir. 1972), or at the time the witness is testifying, *United States v. Banks*, 520 F.2d 627 (7th Cir.1975). *See generally* 3A J. Wigmore, *Evidence* §§ 933–934 (Chadbourne

rev. 1970). As Wigmore points out, however, "a general *habit of intemperance* tells us nothing of the witness's testimonial incapacity [unless it involves] actual intoxication at the time of the event observed or at the time of testifying." Hence, because its bearing on moral character "does not involve the veracity trait . . ., it will usually not be admissible." *Id.* § 933 at 762 (citation & footnote omitted); *see United States v. Holman,* 680 F.2d 1340, 1352–54 (11th Cir.1982); *United States v. Sampol,* 636 F.2d 621, 666–67 (D.C.Cir.1980) (per curiam); *United States v. Ible,* 630 F.2d 389, 394 (5th Cir.1980); *Springer v. Reimers,* 4 Cal.App.3d 325, 84 Cal.Rptr. 486 (Ct.App. 1970). No foundation was laid here to permit evidence of alcohol consumption to come before the jury; there was no indication that the witness was under the influence of alcohol or drugs either at the times she observed the events in dispute or at the time she was testifying. As to the relapse that she suffered after the assaults upon her, it was well within the discretion of the district court to exclude such evidence, *see* Fed.R.Evid. 611(a)(3).

■ Appellants also argue that they were wrongly forbidden to cross-examine Joanne Barone in connection with her mental illness or psychiatric problems; but their request to the trial judge was solely for permission to cross-examine her regarding her drinking problem and they never requested permission to impeach her relative to any mental illness. They therefore cannot raise these arguments on appeal. *See United States v. Braunig,* 553 F.2d 777, 780 (2d Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977); Fed.R.Crim.P. 12(f).

To be sure, appellants had sought *Brady* materials in their pretrial motions regarding any report or memorandum concerning any psychiatric or psychological treatment the witness may have received. But there is no showing that the Government possessed any information regarding such psychiatric treatment of Joanne Barone other than the treatment she sought as a result of being beaten and the threats against her

safety and the safety of her children. The Government, of course, has no obligation to seek out such evidence, *see United States v. Riley,* 657 F.2d 1377, 1386 (8th Cir.1981), *cert. denied,* 459 U.S. 1111, 103 S.Ct. 742, 74 L.Ed.2d 962 (1983). At no time were psychiatric records produced nor was any continuance to produce the records requested. The Government provided copies of all memoranda of interviews of Joanne Barone, including the letter she wrote to the Postal Inspector describing the extreme pressure she was under as a result of the assaults, her suicide attempt, and her fear for the safety of herself and her children.

■ The trial judge also declined to allow extrinsic proof as to two instances of conduct of Joanne Barone to attack her credibility. One involved an "anonymous phone call" she made to her brother-in-law Joseph Barone saying that Michael Barone's "children were in trouble," evidently because she was not invited to a Christmas party. The other incident involved the harassing of Angela Grant and Michael Bumphus between December 1985 and mid-March 1985. Appellants argue that the testimony concerning these extrinsic incidents would prove that her ability to perceive, record, and recall at that time was impaired. Fed. R.Evid. 608(b), however, specifically prohibits proof by extrinsic evidence of specific instances of the conduct of a witness for the purpose of attacking or supporting credibility, other than conviction of crime as provided in Fed.R.Evid. 609. Such specific instances of conduct may be inquired into only on cross-examination in the discretion of the court. *See United States v. DeLillo,* 620 F.2d 939, 947–48 (2d Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); *see also* 3A J. Wigmore, *supra,* § 979 (Chadbourne rev. 1970). Here the trial judge's permitting inquiry on cross-examination but not allowing proof by extrinsic evidence was proper under Fed.R.Evid. 608(b) because the incidents were unrelated in time and substance to the charges in the indictment.

### B. *The trial court's conduct*

The appellants argue that the court's conduct deprived them of a fair trial; the

court is said to have shown hostility toward the defense counsel, the defense case, and defense witnesses. The hostility is said to have taken many forms, including threats, insults, impatience, limiting cross-examination by defense counsel, excluding evidence, initiating objections, adverse rulings, and initiating questions of witnesses to establish points for the Government. DiPaolo's counsel also argues that the court's actions had a "chilling effect" on him and hence his client's Sixth Amendment rights. Counsel cites some seventy-seven specific instances in the transcript of the trial to support his contentions. We have examined them closely. Most times that the court is critical of counsel occur out of the presence of the jury. Many of the suggested examples of judicial misconduct are simply misstatements or readings taken entirely out of context.

For example, it is said that at Tr. 229, line 12, the judge "suggests that he would like to see defense counsel hung from the nearest yard." In fact, counsel had been permitted to look at Lucille Barone's personal diaries and the court simply said, out of the presence of the jury,

> Frankly, Mr. Carlisi, if I tell a jury that these are her personal diaries that were delivered because they were demanded by the defendants and you were to use them, I do not think one of the women— any of the women or anyone who keeps a diary would like to do anything other than hang you at the nearest yard—forgetting about your client—but that may be a risk that maybe I ought to let you take.

Again, it is said that the judge stated, at Tr. 231, line 20, that the "[d]efense counsel is a 'stupid examiner.'" In fact, in discussing a stipulation as to a question and answer given by Lucille Barone in a preliminary hearing, the court said, referring to Government counsel, "He will stipulate when the time comes for you to offer your evidence that you may have that question and answer as part of your case so you can sum up and say this is what she said." Defense counsel Carlisi replied, "Fine.

That will take care of it." The court then said, "And he can stand up and say that is not what she says at all, that is what some stupid examiner asked her—."

It is said that at Tr. 478 the judge "suggests [d]efendant DiPaolo guilty of giving witness black eyes." This allegation is in reference to the witness Joanne Barone and the assault on April 15, 1985. In fact, the court said nothing about DiPaolo; what was said, moreover, was not before the jury. Attorney Carlisi was arguing that past instances of conduct by Joanne Barone might lead the jury to make an inference that the assault was "a self-generated situation relating to the defendant...." The court simply said, in obvious reference to a photograph of Joanne Barone in evidence, "How do you suggest she got these two beautiful black eyes? Self-generation?"

The same thing holds true of objections to conduct or comments of the judge made in reference to Tr. 118, line 22; Tr. 143, line 18; Tr. 230, line 22; Tr. 278, line 10; Tr. 374, line 9; Tr. 486, line 3; Tr. 487, line 3; Tr. 512, line 1; Tr. 548, line 19; Tr. 564, line 7; and Tr. 688, line 4.

In numerous other instances the judge's intervention into the questioning of a witness, his criticism of counsel, or his other conduct was not improper or did not harm the defense or prevent a fair trial. For example, at the very beginning of the trial the judge criticized the attorney for not rising to make an objection. Appellants complain that the judge persisted in criticizing the attorney even after he apologized. Yet rising to object is so fundamental to the trial of a case that we do not understand what the complaint is about; a trial judge must know immediately from where an objection is coming to be able to stop the witness at the point of an objection. To conduct a trial properly most trial judges quite properly insist that counsel stand to make an objection.

Again, at Tr. 143, line 18, where the judge sustained, on behalf of defense counsel, an "objection that [had] not been made," it is said that there was "[i]mplicit

criticism of defense counsel for not making an objection." This is simply not so; there is no criticism in sustaining an objection that has not been made by pointing out that it has not been made. Otherwise, the jury would be hard put to know what was happening.

Similarly, at Tr. 630, line 5, where it is said that the judge expressed incredulity at a defense witness's statement, what actually occurred was that an alibi witness for appellant Snyder said that Snyder had not called before arriving at their place in Florida. The court then said, "You mean he just arrived?" The witness responded, "Yes, sir." The court: "With no notice?" The witness: "No, sir. I had a Saturday off and...." The court: "He just did not call; he just showed up one afternoon?" The witness: "Yes, sir. I have people do that quite a bit."

There are a few instances that are called to our attention where obviously the judge permitted some exasperation to show or made a comment that would have been better left unsaid. For example, at one point he cautioned defense counsel that

> on cross-examination you are not to go into any location or any type of detail that would reveal the location of this witness, or you may find yourselves personally saddled with another relocation, which is always a good remedy for counsel. It is a good deterrent from going that far.

But this caution, or threat, was made out of the presence of the jury and the court simply wanted to impress counsel with the seriousness of its ruling.

At another time, the court stated outside the presence of the jury, "If I reprimand counsel which I do not solely in this case but almost every case I try, it is because they have overstepped, in my opinion, either the lines that we agree upon or general fairness...." The judge went on to say that he would continue to point out to the jury when he thinks counsel oversteps the line, for if that is not done, "defense counsel repeatedly use every trick and device to push the line, the case beyond the limits."

Here the judge was making clear that counsel should play within the rules; we view this as simply talking about criminal cases generally and a fair warning that if counsel attempts to play outside the rules, the court will not hesitate to point it out to the jury.

It is claimed that at Tr. 522, line 3, the judge "makes scientific determination in favor of the government." This again was outside the presence of the jury and the "scientific determination" was that drinking twelve bottles of beer in a day was different from consuming twelve shots of hard liquor in a short space of time. True, the court was thinking in terms of "shots of beer" rather than "bottles of beer," but we do not see how this affected the ruling relative to bringing out Joanne Barone's drinking habits.

■ The judge did tell attorney Carlisi out of the presence of the jury at Tr. 559, line 14, that he was misleading the jury by skipping evidence and taking it out of context, and at Tr. 570, line 10, again out of the presence of the jury, the judge suggested that Carlisi intentionally posed an improper question in asking Joanne Barone if she had a drinking problem at the time that this incident occurred on April 15. Most of the comments that the judge made adverse to counsel were made outside the presence of the jury and indeed had some basis in the record for being made. Our examination of the matters called to our attention and of the transcript as a whole indicate that in no way was the judge's behavior so prejudicial that it denied the defendants a fair, as opposed to a perfect, trial. *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir.1985). As we have noted in a similar case:

> Experience teaches that quotations lifted out of the transcript can often be unintentionally misleading, since they usually fail to give a true or complete picture of the framework for and background of the allegedly prejudicial comments. Counsel, being advocates, also tend to attach excessive significance to some remarks and to overlook counterbalancing portions of the record.

*United States v. Weiss,* 491 F.2d 460, 468 (2d Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974). If there was any error whatsoever, it certainly was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

C. In limine *ruling*

■ It is now established that a trial court's *in limine* ruling concerning impeachment of a witness with a prior criminal conviction is not subject to review on appeal if the witness does not testify. *See Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). Thus, appellant Snyder's claim that the trial court erred in denying his motion *in limine* to prevent the Government from impeaching his alibi witness Edward Pacitto with a prior criminal conviction is not before us because Pacitto did not take the stand. *See United States v. Weichert,* 783 F.2d 23 (2d Cir.1986) (applying *Luce* where impeaching inquiry ruled admissible under Fed.R.Evid. 608(b)).

D. *Other complaints as to trial*

Appellants' other complaints about the trial warrant little discussion. The Government's rebuttal summation mentioned the fact that Edward Pacitto did not testify. This remark was made only because Snyder's counsel told the jury in his opening statement that he was going to call three alibi witnesses, including Edward Pacitto, and yet called only two; in addition, Mrs. Pacitto, one of the two, testified that she discussed her testimony with her husband, and that her testimony was based on not only what she remembered but on what her husband remembered. Mr. Pacitto, however, was not called for reasons above suggested. Moreover, defense counsel in his summation spoke of Mrs. Pacitto's testimony and questioned where the Government witnesses were who could have shown that "Dusty" was not in Florida. The whole question, of course, was whether Snyder was in Florida during the time Mrs. Pacitto testified he was. We fail to see how the Government's rebuttal summation was anything but proper.

The decision of the magistrate denying appellant Weather's motion for severance pursuant to Fed.R.Crim.P. 14 was clearly not an abuse of his discretion because the defendant has a heavy burden of demonstrating facts showing "that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial." *United States v. Rucker,* 586 F.2d 899, 902 (2d Cir.1978); *see United States v. Losada,* 674 F.2d 167, 171 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). As the magistrate correctly ruled in denying the motion, it is inevitable in any multidefendant conspiracy prosecution that some defendants will be shown to have been more culpable than others. *See United States v. Panza,* 750 F.2d 1141, 1149 (2d Cir.1984). The court's instruction that the jury give "separate, personal consideration to the case of each individual defendant" was quite proper and protective of a fair trial. *See United States v. Weisman,* 624 F.2d 1118, 1130 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980).

Appellant Weather's membership in the Hell's Angels motorcycle gang came into evidence by way of Lucille Barone's direct testimony, recounted above, to the effect that she was told that Weather and the Hell's Angels would not appreciate her going around blabbing to the police, and that DiPaolo would not be able to stop the members of the Hell's Angels from harming her if she continued talking to the police. She knew that Weather was a member of the Hell's Angels and she was fearful of them. All of this evidence was relevant and probative as to whether appellants used their membership or association with the Hell's Angels to intimidate Lucille Barone and whether she had a reason to fear the defendants. *Cf. United States v. Russo,* 708 F.2d 209, 214 (6th Cir.) (holding admission of defendant's Mafia reputation not error as probative of the intimidation of the victims), *cert. denied,* 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 682 (1983). Moreover, this testimony was admitted without objection. In any event, the court read to the jury a limiting instruction which counsel found

completely acceptable. Indeed, Weather's trial counsel requested that the curative instruction be repeated in the court's jury charge and it was. There is nothing erroneous here.

### E. *Sentencing*

■ Appellant DiPaolo's and appellant Weather's complaints regarding their sentencing are also to no avail. Of course, the general rule is that a sentence within the legal limits and not based on materially inaccurate or otherwise improper information or communications will not be set aside on an appeal. *See United States v. Dazzo*, 672 F.2d 284, 289 (2d Cir.), *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982); *United States v. Ochs*, 595 F.2d 1247, 1262 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); *see generally* Project, *Fifteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal 1984–1985*, 74 Geo.L.J. 499, 853–57 (1986) (discussing improper considerations in determining sentences). These sentences were neither outside the statutory limits nor grossly disproportionate to the gravity of the offenses involved. Appellant Weather's complaint that he was sentenced to consecutive sentences arising out of the same transaction has no merit. Weather's convictions on Counts III and IV, relating to the assaults on Joanne Barone, were based upon *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), as to which consecutive sentences are proper, *see United States v. Crosby*, 314 F.2d 654, 657 (2d Cir.1963). Furthermore, DiPaolo's ten-year sentence for criminal contempt, resulting from his violation of the court order that he not contact any member of the Barone family while released on bail, was not an abuse of the court's discretion under 18 U.S.C. § 401 (1982) given that DiPaolo not only contacted Joanne Barone but beat her with a screwdriver.

### F. *Assistance of counsel*

■ Appellants DiPaolo and Weather also both claim they were deprived of effective assistance of counsel, thus violating their Sixth Amendment rights to counsel. Under the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a valid ineffective counsel claim must show both that the counsel's performance was deficient, making "errors so serious that counsel was not functioning as ... 'counsel,'" *id.* at 687, 104 S.Ct. at 2064; and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Our review of the record indicates that the representation of DiPaolo and Weather was not deficient under the standard of *Strickland.* That counsel was criticized at times by the court certainly does not show that representation was defective; as noted above, criticism of counsel was often the result of attempts to go beyond the limits of the "rules of the game"—overzealousness does not amount to ineffective counsel under *Strickland.* Both counsel appeared well prepared and had a good understanding of the facts and legal principles involved in the case. Weather specifically claims that his trial counsel should have objected to testimony relating to the stop of DiPaolo's automobile, and yet Weather had no standing to contest the stop. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Weather also claims that trial counsel should have objected to the admission of photographs of Joanne Barone, that he should have called witnesses, and that he should have subpoenaed hospital records of Joanne Barone. However, an objection to the photographs appears without merit, *see United States v. Brady*, 595 F.2d 359, 361–62 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); no evidence has been presented of exculpatory witnesses who may have been called; and it appears that counsel diligently sought whatever hospital records existed, making *Brady* requests for the material and independently investigating their whereabouts. DiPaolo and Weather are not entitled to a perfect defense, *see Wise v. Smith*, 735 F.2d 735, 739 (2d Cir.1984), and the representation of their counsel was entirely adequate. In any event, given the strong evi-

dence against both DiPaolo and Weather, we do not believe that there is a "reasonable possibility" that the outcome would have been different with different counsel. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

### G. *Assaults on Joanne Barone*

Finally, Weather complains that the court erred in denying his motion for judgment of acquittal pursuant to Fed.R. Crim.P. 29 as to the assaults on Joanne Barone. There was ample evidence, however, that these assaults were in furtherance of the conspiracy to intimidate witnesses, and Weather's responsibility for the acts of coconspirators is well established. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). DiPaolo's argument that the assault on Joanne Barone was an "unrelated State assault" is similarly without merit.

The judgment of the district court is affirmed.