George G. SANTA MARIA,
Plaintiff–Appellant,

v.

METRO–NORTH COMMUTER
RAILROAD, Defendant–
Appellee.

No. 296, Docket 95–7230.

United States Court of Appeals,
Second Circuit.

Argued Oct. 27, 1995.

Decided March 18, 1996.

Joseph Smukler, Philadelphia, PA (Fox, Rothchild, O'Brien & Frankel, of counsel), for Plaintiff–Appellant.

William G. Ballaine, New York City (Edward Flores, of counsel), for Defendant–Appellee.

Before FEINBERG, OAKES and CABRANÉS, Circuit Judges.

OAKES, Senior Circuit Judge:

George G. Santa Maria ("Santa Maria") appeals from the judgment of the United States District Court for the Southern District of New York, Kevin T. Duffy, *Judge,* entered after a jury verdict for the defendant Metro–North Commuter Railroad ("Metro–North") on Santa Maria's Federal Employers' Liability Act claim, 45 U.S.C. § 51 *et seq.* (1994) ("FELA"). Santa Maria appeals the judgment on several grounds, arguing that the district court (1) failed to charge *res ipsa loquitur;* (2) made erroneous evidentiary rulings; (3) erroneously allowed interrogation by Metro–North's counsel regarding Santa Maria's receipt of benefits under the Railroad Retirement Act; and, most importantly, (4) abused its discretion in denying a mistrial after demonstrating antipathy towards Santa Maria's case and chastising, holding in contempt, and summarily removing his trial counsel, Joseph Smukler ("Smukler"), as counsel after four days of trial with only two and one-half days for replacement counsel to prepare. We believe that the trial judge's attitude, his treatment of Smukler, and the abrupt change of counsel midway through trial sufficiently prejudiced the plaintiff so as

to require a new trial. Accordingly, we vacate and remand.

## BACKGROUND

Santa Maria worked as a trainman and conductor for Metro–North at the time of his alleged accident. He claims that on December 19, 1990, he was alone in a cubicle in Grand Central Station, napping on a cot supplied by Metro–North for conductors, when the cot suddenly collapsed. Santa Maria sued Metro–North under FELA, 45 U.S.C. §§ 51 *et seq.* (1994), for neck and back injuries sustained during the collapse and for depression caused by his disability.

Santa Maria was not unfamiliar with personal injury suits: he had previously sued Metro–North four times for accidents on the job. In each case, as in the present action, he hired the same lawyer, Joseph Smukler of Philadelphia. The case went to trial before a jury on January 23, 1995.

Because this appeal concerns the fairness of the jury trial, we must examine the trial proceedings, which involved fairly complex medical disagreements among a battery of experts over the plaintiff's neck injuries, in some detail. Santa Maria claims that the court continually badgered Smukler and cast doubt on the veracity of Santa Maria's case by its treatment of witnesses, including the plaintiff. Given these claims and our decision to remand for a new trial, we focus our attention primarily on the actions of the court during the trial proceedings.

The first indication of a potential problem between the court and Smukler came during the direct examination of the plaintiff's first witness, a medical expert. The witness testified that "I had him see a colleague also for a second neurological opinion as to surgery, and he concurred that he felt this was—" whereupon there was a sustained objection. The witness apologized, but Smukler went on to ask, "You said you sent him to someone else who concurred—." The court sustained an objection, adding, "Now, look, counsel, you know that's improper. Next question. Ladies and gentlemen, withdraw what the lawyer just said. Next question."

During the recess with the jury not present, the court gave Smukler a warning in the following language:

THE COURT: Counsel, I have to tell you something. You pull what you pulled before where there was an objection taken that's to purely objectionable material and you repeat it as if it were a fact, I will declare a mistrial and I will charge you for the costs of impanelling the jury and recommend that you not be permitted to practice in this district again. Got the picture?

SMUKLER: I have the picture, your Honor.

THE COURT: Good.

There were no further problems before the jury that day until Smukler took exhibits consisting of x-ray enlargements and attempted to use them through the next witness, a neuroradiologist. Metro–North's counsel objected and the court admonished, "Counselor, look, let me make this very clear. Exhibits are supposed to be shown to the other side before you get to court, not saying, oh, I've got blowups, I've got this. The exhibit. Do you understand?" Smukler replied, "Sure, all right."

On redirect, Smukler inquired, "Has any question or any information given to you changed your opinion that this man has a herniated disc at C4–5 and C5–6?" and received a negative answer. He continued, "It still remains your opinion based on—." The court interrupted, "That's what he said. There goes your summation. Step down, Doctor." After the jury was excused, the court said to Smukler, "I understand this is an experiment that counsel sums up in the middle of a trial. I'm going to let you do it and you will get no summation at the end of it. Do it again, and you'll have none."

Plaintiff's third witness was a certified neurosurgeon who, when asked by counsel which hospitals he worked in, answered, "I went to several hospitals. I am working now out of an outpatient." The court said, "I'm sorry, is that the name of a hospital, outpatient?" The witness said, "No, no, no. I used to work in many hospitals. I am working out of an outpatient now for the last few years." The court: "So you're not working

in any hospital?" The witness: "No." The court: "Okay."

At the end of the examination of the third witness, the following exchange occurred in the presence of the jury:

COURT: Tell me, Doctor, you came way up from Philadelphia today. You didn't come·dressed that way?

DOCTOR: No, I came from Northfield.

COURT: But you didn't wear the white smock?

DOCTOR: I was seeing a patient in Northfield.

COURT: You didn't answer my question.

DOCTOR: I'm sorry?

COURT: Did you wear the white smock up here?

DOCTOR: No. I was wearing the coat and I was carrying the white coat.

COURT: All right, thank you.

The third day of trial began with Smukler calling fellow employees of the plaintiff, who described the cots in the sleeping cubicles at Grand Central. Smukler said to a witness, "I want to show you what I have marked as Plaintiff Exhibits No. 11, 12 and 13 which the defendant has supplied us with, the exact cot involved in the accident. And I want you to look at that, please." Metro–North's counsel objected and the court said (apparently to Smukler), "If you want to testify I will swear you and I will disqualify you to be the lawyer because you cannot testify and be the lawyer in the same case. The way to show an exhibit to the witness is: I show you exhibit so-and-so. Can you tell me what it is? Period."

Later that same day, Santa Maria testified to his treatment and care by various doctors. After Santa Maria's testimony that he had seen Metro–North doctors every month from February 1991 to 1993, Smukler started to repeat the answer, "So from February of '91 to the summer of '93—." The court interrupted to say, "That's what he said. Next question." Smukler: "Okay, all I wanted

to—." The Court: "Remember what I told you yesterday about summations?" Smukler: "No, I wanted to ask him the name of the doctor that he saw." The Court: "Yes, that's fine, that's a question." Smukler: "Judge,—." The Court: "What you're doing—ladies and gentlemen, time for a break. Take 10 minutes."

When the jury had left the courtroom, the following exchange occurred:

THE COURT: Mr. Smukler, if you insist on summing up in the middle of trial, that's fine, but you give up your summation, all right?

SMUKLER: May I be heard on that, sir?

THE COURT: Sure. All right.

SMUKLER: [sic] Stand up. Don't they do that in Philadelphia? [1]

SMUKLER: No.

THE COURT: They don't?

SMUKLER: They do.

THE COURT: You know, I have had some Philadelphia lawyers up here and they were wonderful.

SMUKLER: I'm trying to be. I'm trying to do everything this court requires.

THE COURT: Fine. Then please stop summing up in the middle of the trial. If you want to get up and testify, which you have done an awful lot—in fact, you introduce things which I don't think the witness could, there is an objection. But I warned you about this idea of summing up. Oh, I've got a wonderful point. I'm going to make sure it gets home to the jury. I'm going to repeat it again and again. Fine, but you give up your summation.

SMUKLER: Your Honor, on that last question that I asked, I started, if you'll but hear me, I asked him regarding that in order to ask him during all that period of time that you were being seen, what was the name of the doctor. I could not complete it. That was the question.

THE COURT: Fine. Can't you just ask what was the name of those doctors? I must tell you the entire exercise so far has

---

1. We think the transcription here is clearly in error and that it is the court that said, "Stand up, don't they do that in Philadelphia?"

taken an hour and 15 minutes. Anybody who was doing it properly could have done the whole thing that you've done up to this point in approximately 17 to 20 minutes, but what you do is muck around and muck around and you insist on summing up. And if you continue to insist on summing up, you waive your summation. It's that simple. Ten minutes.

Later in Santa Maria's direct examination, Smukler sought admission of the reports of the Metro–North doctor into evidence. When asked what they were being offered for, Smukler said "that the railroad doctor examined him on 19 occasions between January of—:" The court interrupted him to say, "That's not what it says at all. It doesn't say that. They don't come in." Smukler then said, "It says that he was examined—." The Court replied, "It doesn't say that. Next."

Soon thereafter, Santa Maria started to read from a request for medical services that Smukler was attempting to offer into evidence and the court interrupted to say, "Look, the whole deal with putting in an exhibit is not to have it read first." The witness said, "I don't know, this is my first time up here." The Court: "First time you saw it?" The witness: "No, this is my first time in court. I am nervous." The Court: "You mean to say counsel didn't talk to you beforehand?" (pause) The Court: "Yes. Next question."

The plaintiff finished presenting his case, subject to his cross-examination, on Wednesday, January 25. On Thursday, the defendant called its first witness, a medical expert. In cross-examination, Smukler asked, "Did you report about a report of a Dr. Mandel within the confines of your report?" There was an objection on the grounds that the Mandel report was not in evidence. The following ensued:

SMUKLER: Your Honor, this gentleman has reported on an EMG report, and I have a right to cross-examine him on it.

THE COURT: You can't. If he didn't have it, you can't cross-examine him about the report.

SMUKLER: He did have the report, and he reports on it.

THE COURT: You asked him if he had the report, and he says here that he didn't have it. You're stuck with the answer.

SMUKLER: I'm stuck with the answer that he has in here that he reviewed the report and he says—

THE COURT: You're finished. Sit down. Ladies and gentlemen, take a break. I've made a ruling. Sit down. Mr. Marshal, assist him to sit down.

After the jury left the courtroom, the court proceeded:

THE COURT: Mr. Smukler, I am holding you in contempt and I will give you 10 minutes to make any—

SMUKLER: I'm sorry.

THE COURT: —petition you wish to before I sentence you. Do you understand me? You have counsel apparently with you. She can—

SMUKLER: She is not counsel.

THE COURT: Well, then, you will have to do it on your own. You have 10 minutes.

SMUKLER: To do what, Sir?

THE COURT: To make any pitch you want to.

SMUKLER: Okay.

THE COURT: You're going to be sentenced for contempt.

SMUKLER: Okay, okay.

THE COURT: Section 401, Title 18, provides, "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, misbehavior of any person in its presence."

Mr. Smukler, do you have anything to say for yourself?

SMUKLER: Yes. I think the actions of the Court and the irate manner in which it proceeded in front of this jury requires me to ask for a mistrial, your Honor.

THE COURT: Mistrial is denied. All of the activities which brought about the contempt were intentionally done and, since they were intentionally done, that is like asking for a mistrial since you see you are losing the case. You are not getting it.

After Smukler sought to get his objection to the handling of the report on the record, the exchange continued:

> SMUKLER: And if I can't ask on cross-examination of a doctor what he says in his report regarding EMG findings, then something is wrong.
>
> THE COURT: Something is wrong.
>
> SMUKLER: Your Honor, let me finish, and I'm done.
>
> THE COURT: Something other than that is wrong, but we will get to that.
>
> SMUKLER: As you wish, your Honor. Your actions in front of this jury to me personally—
>
> THE COURT: To you personally?
>
> SMUKLER: To me personally, as an individual, has hurt my client during the course of this trial.
>
> I'm done.
>
> THE COURT: You are done.
>
> SMUKLER: I am done.
>
> THE COURT: You have an opportunity to hire a lawyer.
>
> SMUKLER: I will do so.
>
> THE COURT: Good, hire him.
>
> I have to tell you, I have seen people who were arrogant before, but nothing like the arrogance that exuded from you. You are going to do what you please, regardless of what the Court rules. You are going to do exactly what you want to do. I have never, never in 22 years had to tell a lawyer two, three times and then tell a marshal to go and tell him, force him to sit down.
>
> Is that what happens in Philadelphia?
>
> SMUKLER: Forget Philadelphia.
>
> THE COURT: No, I am not going to forget Philadelphia because that is where you are from. Is that true?
>
> SMUKLER: Yes, your Honor.
>
> THE COURT: And that apparently is where you have tried your cases.
>
> SMUKLER: I have tried 50 cases in this court.
>
> THE COURT: I have had lots and lots of cases in this court—
>
> SMUKLER: I'm sure you have.

> THE COURT: —and your actions are much like Chakwe [sic] Lumumba, who was in a criminal case and was the only one I ever held in contempt.

The problems continued after this exchange. Later that afternoon, after chiding Smukler for having "poorly, if ever, prepared," the court said, "[O]thers saw you motioning to the witnesses, the four witnesses you had [meaning the fellow conductors] during cross-examination, indicating what the answer should be." Smukler denied this as "absolutely untrue." The judge's law clerk was then called as a witness and said that Smukler motioned either in an affirmative or negative way during the cross-examinations. Smukler stated to the court, "I have been a lawyer for 40 years and I have never been accused of that. If I had done it, it would have been proper for Your Honor to have called me to sidebar—if I did it, it was unintentionally and that has nothing to do, in my opinion, with what just happened here." The court said:

> It is a buildup of things . . . you are told not to sum up, you do what you please. You are told not to do things, and you go ahead and you do what you want. And that's the way you operate . . .

When Smukler made later reference to the court's contempt holding, the court said that the reason for holding him in contempt was his "failure to obey a direct order of the Court and for your display of absolute arrogance and just an intent not to pay any intention on the orders of the court. It is very simple. I told you to sit down. You wouldn't. I told you to sit down again. You wouldn't." Smukler said, "Come on, your Honor, that I wouldn't sit down?" The Court: "Come on yourself. This is a continuation of your arrogance. If you wanted to show me something, you could have done it after the jury left. But no, you wanted to make sure that the jury knew that you had no regard for the lawful authority of this court. In that way, sir, you are in contempt—."

At the time of the afternoon break, the court said, "Mr. Smukler, you indicated you had tried 50 cases in this district this morning. Have you ever been admitted to the bar

of this district?" Smukler said, "No, never. I have been before the circuit." The court said, "You think that things are done from the seated position and, believe it or not, there is a requirement that you be admitted to the bar."

After the trial was adjourned, the court said to Smukler that it expected that he would return to trial the following Monday with the local counsel who had filed the plaintiff's complaint. The court added that "[t]he last time I looked, it was against counsel ethics to share fees with somebody who is not a member of the bar, so I guess he had better come."

On Friday morning, the court held a sentencing for contempt at which Smukler appeared with private counsel and with Cye E. Ross, the local counsel for Santa Maria. Smukler's lawyer moved for Smukler's formal admission to the court *pro hac vice,* but the court denied the motion. The court then told Ross that it expected him to be there to finish the trial of the case on Monday morning; Ross could have Smukler as a legal assistant, but Smukler would not be permitted to ask any questions. Smukler's private counsel requested and obtained an adjournment of the contempt sentencing until February 14, 1995.

On Monday afternoon, the trial resumed. Ross introduced local counsel Frank Cerniglia, an attorney in his office, who then proceeded to represent Santa Maria. The first order of business was a renewed motion for Smukler's admission *pro hac vice* and, when that was denied, a renewed motion for mistrial. Local counsel argued that despite his efforts to prepare, he was no substitute for counsel who had been present and involved in the case from the beginning. This motion, too, was denied.

After testimony by a medical expert for the defense, Santa Maria was called back for cross-examination. During its questioning, Metro–North sought to demonstrate discrepancies between his depositions and testimony as to the circumstances of his fall, his conduct thereafter, the extent of his injuries, and his previous accidents. Metro–North also questioned Santa Maria's statement that he would have been homeless after the acci-

dent but for his parents, asking if it were a fact that after the accident he was receiving benefits of $310 every two weeks.

Following the close of evidence, the charging conference and the charge, the jury was out for just under two hours and brought in a defendant's verdict on Wednesday, February 1, 1995.

On February 14, 1995, Smukler submitted legal papers to the court shortly before the time set for his contempt sentencing and the court adjourned the matter. On February 27, 1995, the court issued an order vacating the finding of contempt.

In the order, the court said that "all counsel who regularly appear in the Southern District of New York are aware that in arguing evidentiary rulings they cannot state before the jury, things as fact without proof nor even an expectation of proof. The contemnor cont·ued to violate this rule throughout the trial and also engaged in other improper courtroom antics." Additionally, the court stated that Smukler appeared as trial counsel despite the fact that he was not a member of the bar of the district, and that "[t]his, along with other improprieties which will be discussed below, formed the background for the contempt finding."

The court then went on to say that Smukler had been held in contempt when he "wished to dispute an evidentiary ruling by arguing that he had knowledge that the facts as given by the witness were not true." The court noted that, as a result of an incident which had occurred before he became a judge, he always instructed counsel to remain seated while the jury entered and left the courtroom, and that in this trial "[o]n every occasion in which there was a break, I excused the jury and instructed counsel for both parties to sit or remain seated." The court elaborated on the record by stating that after receiving a contrary ruling from the court, Smukler "let out a grunt of exasperation, throwing out his hands and looking at the jury. Although directed to sit down by me, he chose not to do so and, instead, momentarily blocked the jury's path to make sure that they were aware of his exasperation." He was again told to sit down and

again refused to do so, and in fact had "continued standing in place as the jury left while the Marshal had to walk some 35 to 40 feet to escort him to his seat." The court added that "the entire display was obviously intended to cause a mistrial" since counsel understood that his case "was being lost by his own ineptitude and lack of understanding of the rules of evidence, unpreparedness, and general lack of competence."

The court further added that its determination as to Smukler's desire to obtain a mistrial was based "not only on his demeanor, but also on the fact that during the cross-examination of his own witnesses, he was caught as he continually sought to signal them...."

The court went on to say that there was "absolutely no doubt in [its] mind that Joseph Smukler was in contempt of court and deserves to be punished" but that the maximum he would be fined would be from $100 to $250. Because Smukler hired partners from two large New York law firms to represent him in the contempt matter, the court assumed that "his legal fees will far exceed that amount." The court also noted that he had failed "to obtain his portion of what he viewed as most likely a juicy settlement of Mr. Santa Maria's claim against Metro North." In the judge's busy court, there was "little time to be wasted on the antics of people like Joseph Smukler," and "it would add nothing to the dignity of this court to continue this proceeding." By vacating the contempt, the court would be "rid of an unwanted and burdensome matter," and it was "in the interests of judicial efficiency" and not for the reasons advanced by Smukler's counsel, that the contempt was vacated.

Santa Maria now appeals the jury's verdict against him.

## DISCUSSION

Santa Maria raises four issues in this appeal. First, he asserts that the trial court should have charged the jury on the doctrine of *res ipsa loquitur*. Second, he claims he was prejudiced by the court's decision to allow Metro–North to question Santa Maria regarding monetary benefits he received as a result of his injuries. Third, he contests several evidentiary rulings. Finally, Santa Maria claims that the trial court erred in denying his motion for mistrial. Because we find his final claim determinative, we discuss the first three claims only briefly before turning to the merits of Santa Maria's mistrial contention.

### A. *Res Ipsa Loquitur*, Admissibility of Benefits Payments, and Other Evidentiary Rulings

We find that the district court properly rejected Santa Maria's request that the jury be instructed on the doctrine of *res ipsa loquitur*. In order to prevail under a *res ipsa loquitur* theory, a plaintiff must show that

(1) the event was of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it was caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it was not due to any voluntary action or contribution on the part of the plaintiff.

*St. Paul Fire & Marine Ins. Co. v. City of New York*, 907 F.2d 299, 302 (2d Cir.1990); *see generally Restatement (Second) of Torts* § 328D (1965). Here, the doctrine of *res ipsa loquitur* does not apply because Santa Maria testified that he was napping alone in a cubicle on the cot when it broke. Though the cot was supplied by Metro–North, it was not within the exclusive control of the defendant as a matter of law because a third party, namely Santa Maria, had access to the cot when it allegedly broke. *See St. Paul Fire*, 907 F.2d at 303.

With regard to Santa Maria's claims of evidentiary errors and improper benefits questioning, we need not review these issues because we are vacating this case for the reasons discussed below. The evidence and questioning at the new trial will inevitably proceed differently from the first trial, and there is no certainty that Santa Maria's current claims will be renewed by these future proceedings. We note, however, that photographs of the collapsed cot excluded by the court should not be excluded solely for the reason that the cot was not in its original location, as it was Metro–North that moved the cot. We note also that the gener-

al rule in FELA cases is that evidence of payments made to plaintiff from collateral sources is not admissible, *Eichel v. New York Central R.R. Co.*, 375 U.S. 253, 255, 84 S.Ct. 316, 317, 11 L.Ed.2d 307 (1963) (per curiam), though such evidence may be admissible if the plaintiff puts his financial status at issue. *See Lange v. Missouri Pacific R.R. Co.*, 703 F.2d 322, 324 (8th Cir.1983). Should the court find evidence of benefits payments admissible at the new trial, it of course must carefully limit the admission of the evidence so as to avoid undue prejudice to either party, taking into account that railroad sickness benefits are payable for only a limited period of time. 45 U.S.C. §§ 351 *et seq.* (1994).

## B. Motion for a New Trial

■ We now turn to Santa Maria's claim that the trial court erred in failing to grant a new trial. Santa Maria contends that he was prejudiced by the district court's antipathy toward both the merits of the case and Smukler, plaintiff's trial counsel, and by the court's refusal to grant a continuance in order to allow replacement counsel to prepare. We agree, and therefore vacate the judgment and remand for a new trial in front of a different judge.

■ A new trial must be granted if the court determines that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). We review the district court's refusal to grant a new trial for abuse of discretion. *See Witco Chemical Corp. v. Peachtree Doors, Inc.*, 787 F.2d 1545, 1548 (Fed.Cir.), *cert. dismissed*, 479 U.S. 877, 107 S.Ct. 258, 93 L.Ed.2d 241 (1986); *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1196 (7th Cir.1992).

■ Although we have repeatedly observed that due process requires a fair trial rather than a perfect trial, *see, e.g., Ricketts v. City o₁ Hartford*, 74 F.3d 1397, 1416 (2d Cir.1996); *United States v. Manko*, 979 F.2d 900, 905 (2d Cir.1992), *cert. denied*, 509 U.S. 903, 113 S.Ct 2993, 125 L.Ed.2d 687 (1993), a court must strive for "that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." *Glasser v. United States*, 315 U.S. 60, 82, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942). Indeed, "[a] trial judge must be especially cautious and circumspect in language and conduct during a jury trial." *Coast–to–Coast Stores, Inc. v. Womack–Bowers, Inc.*, 818 F.2d 1398, 1401 (8th Cir.1987). After reviewing the entire record, we conclude that the court did not behave impartially.

Throughout the trial, the court displayed an antipathy to Santa Maria's claim that went beyond judicial skepticism. Metro–North presented evidence that Santa Maria was a litigious plaintiff whose neck had been hurt prior to the cot incident and who had brought four previous claims against Metro–North for other injuries while represented by the same firm. In essence, Metro–North tried to prove Santa Maria was a malingerer and was aided in its efforts by the court's comments in open court and its questioning of witnesses. For example, the jury could have inferred from the judge's remark "[y]ou mean to say counsel didn't talk to you beforehand?" that the judge thought Santa Maria had been improperly coached. The sarcastic cross-examination by the court of the plaintiff's expert witnesses, e.g., "is [outpatient] the name of a hospital?" and "did you wear the white smock up here?", plainly conveyed the court's skepticism as to the plaintiff's case. To be sure, having a doctor appear in a white coat invited some comment and perhaps justified some of the court's annoyance, but hardly such remarks. The court's behavior tainted the jury's perception of the merits of Santa Maria's claim and unfairly prejudiced the plaintiff.

While credibility of the plaintiff was sharply at issue in the case, Smukler's credibility also played a major role. Defense counsel had, in its opening statement and subsequent interrogations, suggested that Santa Maria, a New York plaintiff who had been previously represented by this Philadelphia lawyer with Philadelphia medical experts, had gone back to Smukler to fabricate a case against the railroad. Metro–North's attempt to put the plaintiff's lawyer on trial, so to speak, was aided by the court's rather one-sided han-

dling of Smukler's leading questions [2] and follow-up questions, which the court characterized as testifying and summation. Though a court must control courtroom proceedings and must reprimand improper conduct by attorneys, *see e.g. United States v. DiPaolo*, 804 F.2d 225, 231 (2d Cir.1986) (holding that judge may require attorney to stand to make an objection), here the court did not even provide Smukler an opportunity to complete his explanations. For example, the court refused to allow Smukler to explain the basis for admission of the reports of a Metro–North doctor, summarily stating "they don't come in."

The court apparently felt justified in its behavior because it believed that Smukler grossly transgressed the bounds of lawyerly conduct. It even compared Smukler to an attorney it previously had before it, Chokwe Lumumba. In *United States v. Lumumba*, 794 F.2d 806 (2d Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 125 (1986), however, we upheld attorney Lumumba's conviction for criminal contempt for constantly badgering the judge and intimating that the judge was racist ("a disgusting bigoted partial joke") and less intelligent than Lumumba ("I probably finished higher in my law school...."). *Id.* at 812–13. Here, Smukler said nothing even approaching the level of disrespect displayed by Lumumba and cannot fairly be compared to him.

Nevertheless, when Smukler failed to sit down quickly enough to suit the court, the court held him in contempt. As the court said, Smukler was held in contempt for "failure to obey a direct order of the Court and for your display of absolute arrogance and just an intent not to pay any intention on [sic] the order of the court. It is very simple. I told you to sit down. You wouldn't. I told you to sit down again. You wouldn't." We doubt very much if the now-vacated finding of contempt could have been sustained on this record on appeal,[3] although the court later attempted to expand on the record in recounting the incident.

After the court held Smukler in contempt, it learned that Smukler, an out-of-state attorney, had never formally filed for admission to the court *pro hac vice;* the court consequently denied Smukler's motion to appear as such. It is true that the rules of the Southern District require that an out-of-state attorney must seek permission "to argue or try a particular case in whole or in part as counsel or advocate" and must provide an updated certificate of good standing in his own state bar. S.D.N.Y. & E.D.N.Y. Gen.R. 2(c). Concededly, Smukler did not follow this procedure. He had, however, appeared in many FELA cases in New York and other federal courts, and explained during at least two pretrial conferences that he was from Philadelphia and would be appearing as trial counsel with associate New York local counsel. While Smukler was mistaken in not following the letter of the local rules, the court permitted him to commence the trial.

It has long been the policy of this circuit to permit out-of-state lawyers who specialize in areas of federal law such as FELA to work with local counsel on a plaintiff's federal claim. *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161 (2d Cir.) (en banc), *cert. denied*, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966). We note that a FELA plaintiff such as Santa Maria may have a particular need to hire out-of-state counsel because of the highly specialized nature of the law in this area. As stated by Judge Friendly in *Spanos*:

> In an age of increased specialization and high mobility of the bar, th[e right to legal assistance] must comprehend the right to bring to the assistance of an attorney admitted in the resident state a lawyer licensed by "public act" of any other state who is thought best fitted for the task.

2. In connection with Metro–North's first witness, a Dr. Soffin, Metro–North counsel said, "So, would you say then that whatever trauma he suffered to his neck was no minor trauma at that point, it could cause a loss of curvature to his neck?" Smukler said, "Your Honor, I would appreciate it if he would not lead the witness and ask him questions." The court replied, "Yes. Go ahead and answer that one." This was at least as much a leading question as any asked by Smukler.

3. At oral argument in this court, Smukler represented that in Philadelphia courts it was customary to stand up when the jury enters or leaves the courtroom and that this accounted for his failure to immediately obey the trial judge.

*Id.* at 170. We take it that Smukler assumed, in light of this policy and his representations to the court, that he had been implicitly admitted *pro hac vice* in order to try the Santa Maria case. *Cf. Kirkland v. National Mortgage Network, Inc.*, 884 F.2d 1367, 1370–71 (11th Cir.1989) (attorney after introduction functioned as counsel for five months without objection). We do not suggest that this assumption was reasonable and we trust that attorneys not admitted to a court will abide by the proper procedures. In the context of this case, however, the court's refusal to admit Smukler *pro hac vice* could be attributed its general feeling about the frivolous nature of Santa Maria's claims and Smukler's performance at trial.

After the court's *pro hac vice* ruling, it ordered local counsel to continue the case in place of Smukler and denied local counsel's motion for a continuance to prepare. Though the court allowed Smukler to serve as a legal assistant to local counsel, it did not permit Smukler to ask any questions. The court stated more than once that the replacement counsel had plenty of time to prepare, just as in *United States v. Tramunti*, a previous case before it requiring appointment of replacement counsel. In *United States v. Tramunti*, 513 F.2d 1087 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975), however, we found that by failing to grant a four-day continuance, the court deprived the party of effective assistance of counsel. *Id.* at 1116–17. Though *Tramunti* was a complex conspiracy case, it nevertheless stands for the proposition that, when extenuating circumstances arise, a court should grant the parties a reasonable continuance to prepare. Here, the court should have granted a modest continuance to Santa Maria to allow the replacement counsel to come "up to speed," especially given the complicated medical nature of the case.

We note, however, that even if the replacement attorney were prepared, the change in attorneys doubtless conveyed to the jury that Santa Maria's case was not meritorious. The jury had observed the conflicts between the court and Smukler and it had heard the court's questions casting a negative light on the plaintiff's claims. Even though it was an apparent attempt by the court to minimize prejudice, for the jury to then see Smukler simply sitting by, unable to speak on the record, certainly must have created a very bad impression of Santa Maria's case, if not have been downright devastating to it. The remedy of removing Smukler from further active participation in the trial was, in short, too drastic and the effect on the plaintiff's case too severe for us to conclude that plaintiff had a fair trial.

A judge must strive to be a model of patience and impartiality, even when faced with an irritating attorney. Though often difficult to maintain, judicial decorum is necessary to preserve the litigant's right to a fair trial. Here, the court's behavior prejudiced Santa Maria, and it was an abuse of the court's discretion not to grant Santa Maria's motion for a new trial. We believe that Santa Maria should be given another day in court to argue his action.

## CONCLUSION

For the reasons set out above, we vacate the judgment and remand for new trial before a different district court judge. We order that Smukler, if his client wishes him to proceed further in this matter, move under the Southern District Rules for admission *pro hac vice*, though we do not, of course, comment on how the court should decide that motion.