Dorothy PILIGIAN, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 84–2419–Y.

United States District Court,
D. Massachusetts.

July 14, 1986.

Hrant H. Russian, Cambridge, Mass., for plaintiffs.

Karen Green, Asst. U.S. Atty., Boston, Mass., for United States.

### MEMORANDUM OF DECISION

YOUNG, District Judge.

The plaintiff, Dorothy Piligian ("Piligian"), brought this suit against the United States for injuries she allegedly sustained at the Pentagon in Arlington, Virginia. In her one count negligence complaint Piligian alleges that the United States failed to provide reasonably safe folding chairs, and that as a result the chair on which she sat collapsed and caused her injury. This Court's jurisdiction is based on 28 U.S.C. § 1346(b). After the close of plaintiff's evidence as to liability the United States moved, pursuant to Federal Rule of Civil Procedure 41(b), for entry of judgment. For the reasons that follow that motion was allowed and judgment entered against Piligian on April 14, 1986, the parties being informed that this opinion would follow.

### I. Findings of Fact

Pursuant to Rules 42(a) and 52(b) of the Federal Rules of Civil Procedure the Court finds the following facts:

On Wednesday, April 28, 1982, Piligian, her husband, and another couple then in the Washington area visiting friends, decided to tour the Pentagon in Arlington, Virginia. The four drove to the visitors' park-

ing lot outside the Pentagon, registered for the public tour, and spent approximately one hour with a tour guide visiting the public areas of the Pentagon.

The tour concluded in a concourse which is open to the public, the employees working in the Pentagon, and the members of the armed services stationed there. The concourse contains a variety of smaller stores selling candy, books, pharmaceuticals, and convenience items as well as a Woodward & Lothrop department store selling primarily women's apparel. Each of these stores lease space within the concourse, paying a percentage of their gross receipts as rent. This concourse is located directly above the Washington Metro shop for the Pentagon, and both the public and persons having business at the Pentagon or stationed or employed there can pass through the concourse from the Metro line on their way into the office area of the Pentagon proper. With the tour completed, Piligian and her friends wandered in and out of the various stores located in the concourse. Piligian was looking for a gift for the family she was visiting in the Washington area. She purchased a pack of gum for her own consumption.

At the far end of the concourse, a chorus from the Draper High School in Rotterdam, New York was performing. Rows of chairs were arranged before the raised stage where the chorus was singing. Consistent with the practice at the Pentagon whenever an outside group performed in the concourse area, these folding chairs had been placed in position at approximately 8:00 a.m. by employees of the United States Defense Supply Service. Following their usual procedure, these employees opened the chairs, checked to make sure they were set in the open position, and then arranged them so that the audience for the event would have seating. The government employees were well aware that these chairs would eventually wear out, either from long use or misuse. They had been instructed to segregate broken chairs and return them to the area of the storage bins from which the chairs were issued whenever needed. The cursory inspection given by the government employees did not include actually sitting in or placing the weight of an average person on each chair as it was set up.

At approximately 12:00 Noon the Piligians and their friends, attracted by the singing, wandered over to the area of the concourse in which the chorus was performing. They moved to sit in the seats provided. When Piligian herself sat down on one of the folding chairs which appeared to her perfectly normal, it collapsed without warning. Piligian fell to the floor, landing on her buttocks, breaking her coccyx, and rolling over onto her back. In addition to the pain, embarrassment, and dislocation normally attendant upon such an injury, Piligian is one of those who has suffered a poor recovery, and she continues to be bothered by this injury and to suffer pain and some residual disability because of it.

## II. Conclusions of Law

■ The Federal Tort Claims Act provides that the United States shall be liable for the negligent acts and omissions of its agents or employees, "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Since the accident and the alleged negligence occurred in Virginia, the issue here is whether under Virginia law a private person in the position of the United States would be liable for Piligian's injuries.

Under Virginia common law, owners and occupiers of land owe an invitee a duty of ordinary care to maintain the premises in a safe condition and to warn the visitor of any hidden dangers. *Wynne v. Spainhour*, 215 Va. 16, 205 S.E.2d 634, 635 (1974); *Shiflett v. Timberlake, Incorporated*, 205 Va. 406, 137 S.E.2d 908, 910–11 (1964). Although conceding that Piligian was an invitee and it an owner of land, the United States argues that it owed Piligian no duty of care. In support of its argument, the United States relies on the Virginia Recreational Use statute, Va.Code § 29–130.2 (1982), which alters the common law rules

of liability. In relevant part, that statute provides:

> A landowner shall owe no duty of care to keep land or premises safe for entry or use by others for hunting, fishing, trapping, camping, water sports, hiking, sightseeing, horseback and bicycle riding, ... except as provided in (d) hereof.

Va.Code § 29–130.2(b). Subsection (d) creates an exception to this general grant of immunity. It provides that the provisions of subsection (b) "shall not limit the liability which otherwise exists for injuries suffered in any case where permission to hunt, fish, trap, ride, camp, hike, or sightsee ... was granted for a consideration." Va.Code § 29–130.2(d). The United States argues that at the time Piligian was watching the concert she was a sightseer, and that since no fee was paid to the United States for permission to enter the Pentagon, the Recreational Use statute applies. Piligian disagrees, and makes a two-pronged response. She argues first that she was not a "sightseer" within the meaning of the statute at the time of the accident. Second, she argues that "consideration" was present even though the United States did not directly charge a fee. Both arguments are persuasive.

This Court is aware of no legislative history or case law which defines "sightseeing" within the context of the Virginia Recreational Use statute.[1] The cases and commentaries analyzing recreational use statutes in other states, however, provide guidance in interpreting Virginia law. The purpose underlying a recreational use statute is to encourage gratuitous access to private land. Through limited liability, landowners who might otherwise keep their land private are persuaded to permit the public to use the land for the enumerated recreational purposes. Limitations on liability thus achieve a result that rational self interest might otherwise prevent. *See generally*, Note, *Tort Liability and Recreational Use of Land*, 28 Buffalo L.Rev. 767 (1979); Note, *The Minnesota Recreational Use Statute: A Preliminary Analysis*, 3 Wm. Mitchell L.Rev. 117 (1977). Given this underlying purpose, the Court infers that the landowner whose liability the legislature intended to limit is one for whom the existence of the Recreational Use statute provides the primary motivation in allowing the public on his land. The more easily the landowner's decision to permit entry can be explained by self-interest or business considerations, the less likely is the applicability of the statute.

In this case, Piligian argues that she was "shopping" at the time of her accident so that the statute does not apply. The United States responds that Piligian had stopped shopping and resumed "sightseeing," and therefore the statute should apply. Both arguments miss the point. As the above analysis demonstrates, the applicability of the statute depends not on the label one gives to Piligian's conduct, but on the landowner's motivation in allowing her to come upon that particular part of its land. The concert area where Piligian was injured is adjacent to the Pentagon's shopping concourse. As opposed to the area where the tours are taken, the public is free to roam the shopping and concert areas without a guide or special permission. The concourse area is not unlike any suburban shopping mall, where in addition to the shops there are areas for relaxing, listening to music, viewing temporary exhibits,

---

**1.** The Court notes that this case presents novel state law issues of statutory interpretation and the scope of Virginia's res ipsa loquitur doctrine. It is the nature of our federal system that federal courts often are called upon to declare and apply the law of a distant state, even though the federal court cannot lay claim to any particular insight into that state's laws. To further the salutary goal of leaving the development of a state's law to its own courts in the first instance, at least 24 states have adopted procedures by which a federal court can certify controlling questions of law to the state's supreme court. *See* Federal Judicial Center staff paper, *Certifying Questions of State Law; Experience of Federal Judges*, (copy on file at National Center for State Courts). It is unfortunate that Virginia does not have such a certification procedure, for it cannot be that the values and interests of the citizens of Virginia are best served by having a federal court in Massachusetts decide these unsettled questions of Virginia law in the first instance.

or what have you. Compared to the area covered by the guided tour, where the government's only apparent motive for permitting access is to provide the public with an opportunity to view operations within the Pentagon and thus better understand this aspect of our defense establishment, it appears that the shopping and concourse area is the type of place that would be open to the public even in the absence of the statute.

That the United States received a percentage of the gross receipts as rent from the store operators is further evidence of the Government's motivation in permitting access to the shopping and concert areas. Since the revenues generated by the rents are a function of the number of shoppers patronizing the concourse, it is clearly in the United States' pecuniary self interest to open the concourse area to the general public. The adoption of the consideration exception in subsection (d) of the Virginia statute reflects the legislature's view that the incentive of tort immunity is unnecessary and improper where "the potential for profit alone is thought sufficient to encourage those owners who wish to make commercial use of their recreational lands to open them to the public." *Ducey v. United States,* 713 F.2d 504, 511 (9th Cir.1983). Indeed, it is not at all clear in this case that the government has received no consideration for permitting the public to enter. It seems unlikely that the Virginia courts would limit the definition of "consideration" to direct payment of a fee by the invitee to the landowner. *Cf. Graves v. United States Coast Guard,* 692 F.2d 71, 73 (9th Cir.1982). An examination of other recreational use statutes which existed at the time the Virginia statute was enacted suggests that the legislature deliberately chose to speak of consideration, instead of a "fee" or "charge." *See Kesner v. Trenton,* 158 W.Va. 997, 216 S.E.2d 880 (1975); *Smith v. United States,* 383 F.Supp. 1076 (D.Wyo.1974), *aff'd on other grounds* 546 F.2d 872 (10th Cir.1976). Thus, the government's argument that Piligian paid for her gum, but not the right to enter, is a little disingenuous. The United States was a silent partner on every sale, and it was in its economic interest to permit Piligian and others like her access to the concourse area. *Cf. Ducey v. United States, supra* at 513; *see also Hamilton v. United States,* 371 F.Supp. 230, 234 (E.D.Va.1974) (prerequisite to application of Virginia Recreational Use statute is that no considerations have been paid). Again the analogy to the owner of a shopping mall is apt. The Court considers it unlikely that the Virginia legislature intended to grant tort immunity to owners of these malls. Yet the United States' argument here would logically lead to that result. Given all that has just been said, the Court rules that the Virginia Recreational Use statute is not applicable here. Accordingly, the United States owed Piligian a duty of ordinary care to maintain the premises of the Pentagon concourse area in a safe condition.

In order to withstand the government's Rule 41 motion for entry of judgment, however, Piligian was required to show not only the existence of a duty of care, but also a breach of that duty. Under Virginia law, the Court cannot presume negligence from "the mere happening of an accident." *Murphy v. J.L. Saunders, Inc.,* 202 Va. 913, 121 S.E.2d 375, 378 (1961). The United States was negligent only if it knew, or in the exercise of ordinary care should have known, about the unsafe condition of the chair. *Glasscock v. United States,* 207 F.Supp. 318, 321 (E.D.Va.1962), *aff'd* 323 F.2d 589 (4th Cir.1963). In Piligian's case, there was absolutely no evidence from which the Court could infer that the United States should have known about problems with the chair. Indeed, the only evidence concerning the condition of the chair was the testimony of Piligian herself, who said that nothing appeared wrong with the chair before she sat on it.

Apparently conceding that there was no direct evidence of the government's negligence, Piligian argues strenuously that under the doctrine of res ipsa loquitur evidence of the collapse is sufficient to permit an inference of negligence in the circumstances of this case. The Court disagrees.

The Virginia courts will apply the doctrine of res ipsa loquitur only where: (1) The instrumentality which causes the injury was within the exclusive control of the defendant, (2) the defendant has, or should have, exclusive knowledge of the way that instrumentality was used, and (3) the injury would not ordinarily have occurred if those who have the management and control of the instrumentality had used proper care. *Easterling v. Walton,* 208 Va. 214, 156 S.E.2d 787, 789–90 (1967) (citing cases). Although the United States argues that Piligian has failed to satisfy any of these three prerequisites, it is sufficient only to address Piligian's failure to satisfy the third prong of the analysis. *Cf.* W. Keeton, *Prosser and Keeton on Torts* 250 (1984) (alleged lack of control will not prevent application of res ipsa in collapsing chair cases where "evidence reasonably eliminates other explanations").

On the evidence presented at trial the Court is unable to conclude that this incident would not ordinarily have occurred absent negligence of the part of the United States. Neither common sense nor anything in the record compels the conclusion that only poor maintenance or careless inspection will lead to a chair's breaking. It is quite plausible that the defect which caused the collapse developed slowly and was not detectable from normal inspection. The Court is not convinced that the exercise of reasonable care will prevent all, or even most, folding chairs from breaking. In short, it is equally likely that factors other than the United States' negligence caused the chair to break.

Both parties cite a number of "collapsing chair" cases from jurisdictions outside of Virginia. *Compare Couris v. Casco Amusement Corp.,* 333 Mass. 740, 133 N.E.2d 250 (1956) *with Kilgore v. Shepard Co.,* 52 R.I. 151, 158 A. 720 (1932). These cases, none of which are controlling, at most support the proposition that reason-

able minds can differ in the applicability of res ipsa loquitur in the collapsed chair context. As such, they might arguably preclude the Court from ruling as matter of law that the doctrine of res ipsa loquitur has no applicability to this case.[2] They do not, however, limit the responsibility of the Court, in its role as factfinder, in concluding that the evidence presented in this case does not sufficiently eliminate other explanations for the chair's collapse. Accordingly, the Court rules that res ipsa loquitur does not permit an inference of negligence in this case because the Court is not persuaded that the chair would ordinarily collapse only if the United States had been negligent.

In accordance with all that has just been said, the Court rules that the plaintiff has not satisfied her burden of putting forward a prima facie case of negligence. Consequently the government's motion for entry of judgent had to be, and was, allowed.

---

**2.** *But see Stein v. Powell,* 203 Va. 423, 124 S.E.2d 889 (1962) (res ipsa not applicable where mirror fell on child's head in defendant storekeeper's dressing room); *Murphy v. J.L. Saunders, Inc., supra,* (doctrine not applicable where can fell from store shelf on customer's head). The results in these cases suggest that the Virginia courts interpret the doctrine more narrowly than other jurisdictions.