Edward POTTHAST, Plaintiff–Appellant,

v.

METRO–NORTH RAILROAD CO., Defendant–Third–Party–Plaintiff–Cross–Defendant–Appellee,

Herman Miller, Inc., Third –Party–Defendant–Cross–Claimant–Cross–Defendant,

Business Furniture, Inc., Third–Party–Defendant–Cross–Defendant–Cross–Claimant.

Docket No. 03–9008.

United States Court of Appeals, Second Circuit.

Argued: Oct. 14, 2004.

Decided: March 7, 2005.

Ira M. Maurer, Cahill & Goetsch, P.C., Croton on Hudson, NY, for Plaintiff–Appellant.

James M. Woolsey (William G. Ballaine and Sophia Ree, on the brief), Landman

Corsi Ballaine & Ford P.C., New York, NY, for Defendant–Appellee.

Before: OAKES, KEARSE, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge.

Plaintiff Edward Potthast ("Potthast" or "plaintiff") appeals from a judgment in the United States District Court for the Southern District, George A. Yanthis, *Magistrate Judge*, entered after a jury verdict for the defendant Metro–North Railroad Company ("Metro–North" or "defendant") on Potthast's Federal Employers' Liability Act claim under 45 U.S.C. § 51 *et seq.* ("FELA"). On appeal, Potthast argues that the district court should have granted his request for a *res ipsa loquitur* jury charge. Although we believe Potthast presented, as a matter of substantive law, enough evidence at trial to merit a *res ipsa loquitur* instruction, we hold that the district court did not abuse its discretion in refusing to submit said charge.

## I. Background

### A. Facts

At the time of his accident on February 13, 2000, Potthast worked as a railroad maintenance mechanic, or "carman," for Metro–North. He claims that while waiting for his daily assignment in the Metro–North Railroad Harmon Shop Maintenance Facility Armature Room ("Armature Room"), he sat down in one of the chairs, leaned back, and in less than a minute's time, before he could detect any problems with the chair, he heard a pop, the chair collapsed, and he was dropped to the floor. While on the ground, Potthast noticed that one of the chair's support bolts was missing, but that bolt was never recovered. As a result of his fall, Potthast allegedly suffered back and spinal injuries, which he claims were due to Metro–

North's negligence in failing to provide a safe working environment.

Only Metro–North employees had access to the Armature Room, and those who used it most were the employees who worked full-time in the room. The room was also used, however, by other Metro–North employees who worked elsewhere but assembled there in the mornings while waiting to be given their daily assignments. Potthast was one of those who typically waited there, at least during the winter months, when it was too cold to wait outdoors.

Including the chair that collapsed, there were nine or ten similar chairs in the Armature Room. The chair that collapsed under Potthast was normally occupied by Anthony Merante ("Merante"), who worked full-time in the Armature Room and who testified that he had not experienced any problems with the chair. Merante was 6'2" and 225 pounds. Potthast, in contrast, was only 5'7", but weighed approximately 5–10 pounds more than Merante.

### B. Procedural Posture

Potthast began this FELA action by filing a complaint against Metro–North on October 13, 2000. His complaint, which was amended on January 18, 2001, also included a products liability claim against the manufacturer of the chair, Herman Miller, Inc., and the distributor of the chair, Business Furniture, Inc., alleging the accident was the result of a manufacturing or design defect.

On August 21, 2002, Metro–North moved for summary judgment on the ground that there was no evidence that, prior to Potthast's accident, it had notice of any defect in or damage to the chair that would result in a foreseeable injury. In March 2003, at the conclusion of pretrial discovery, the district court (Yanthis,

*M.J.*) rejected Metro–North's motion and ruled that there were disputed questions of fact regarding Metro–North's negligence. At the same time, however, the court, finding as a matter of law that there were no design or manufacturing defects or acts of negligence by the manufacturer or distributor, granted summary judgment to Herman Miller, Inc. and Business Furniture, Inc.

On April 8, 2003, the district court issued a trial order stating that jury selection would begin on August 4, 2003 and, of particular importance given the questions before us, directing the parties to file by July 18, 2003 their proposed voir dire and witness lists, proposed jury instructions, trial memoranda, and motions in limine. Each party submitted memoranda accordingly, and both Potthast and Metro–North also subsequently filed supplemental memoranda soon afterward. In his extensive briefing papers, Potthast did not mention *res ipsa loquitur* as a basis for liability that would be explored in the course of the trial; nor did he submit a proposed *res ipsa loquitur* jury charge. Instead, he presented a theory of the case that chiefly focused on Metro–North's having had notice that the chair in question was in a damaged condition at the time of the accident.

### C. Trial

On August 4, 2003, the jury selection and trial began. Prior to opening statements, the court decided that it would preclude the testimony of three Metro–North employees who were prepared to testify, in essence, that Metro–North had notice that several chairs in the Armature Room needed repair. The court based its decision on the ground that none of the three knew whether repairs, which were at some point made to the chairs, took place prior to the accident or afterward.[1] Merante had a similar recollection of repairs being made to chairs in the Armature Room; but like his colleagues, he too could not determine whether the repairs took place before or after Potthast's accident. Because Merante had additional observations to share, the court decided it would allow Merante to testify in full and make a determination later whether to suppress his remarks about chair repairs.

In his opening statement, Potthast's counsel indicated that on the day in question, when the chair broke, Potthast fell down and sustained two herniated discs in his lower back. A subsequent inspection of the chair revealed that one of the bolts connecting the arms to the seat was missing, and that there was evidence of wear. Counsel asserted that Metro–North, by not properly maintaining the chair, failed to provide its employees with a reasonably safe place to work. But at no time did counsel make any suggestion that the breaking of the chair, in itself, justified an inference of negligence.

By contrast, Metro–North opened by stressing its lack of notice of any defects or damage to the chair. And, it suggested

---

1. Potthast's counsel, Ira Maurer, strenuously objected. He argued that the "defendant was negligent in failing to have procedures in effect which required their personnel to report; if there's evidence that should have been reported but wasn't because there weren't procedures that required them to, it has to go before the jury...." Maurer indicated that he would say the following to the jury: "Here is the information, ladies and gentlemen. The Railroad didn't require these men to report it. They let them go do whatever they want to repair their chairs and management wasn't advised.... It precluded management from taking steps. If they were [aware that] several chairs were having problems, they would have, should have done certain things." Potthast has not, however, raised on appeal the district court's overruling of his objection.

that Metro–North was under the impression that Merante, the employee who regularly used the chair, had no problems with it. Though not critical—or even related—to the substance of the appeal, much of Metro–North's defense centered on Potthast's credibility, or lack thereof. Metro–North emphasized that Potthast had already, on five or six occasions, brought an array of work-related injury complaints against his employer, that Potthast had had back problems prior to the accident in the Armature Room, and that he had concealed his medical history from the doctors who examined him following the accident.

After the opening statements, Potthast proceeded to introduce evidence. Charles Kane, a foreman in the Armature Room, testified that prior to the date of the accident, he became aware of the fact that one of the chairs, which had mainly been used by electrician Edward Orellana, required repairs. Kane recalled that he inspected the damaged chair,[2] repaired it himself,[3] and subsequently advised a senior foreman named Tim Tarkington that there had been a damaged chair, but that it had been fixed.

Merante testified that, though he was the regular occupant of the chair, he never experienced any problems with it. As previously noted, he also recalled observing that repairs had been made to two or three (of the nine or ten) chairs in the Armature Room, but could not say with confidence whether those repairs occurred before or after Potthast's accident.

A third witness—Joseph Petrella, an engineer retained by Herman Miller, Inc. during pretrial discovery who had inspected the chair after the accident—testified that the chair in question was weakened over an undetermined period of time, that one of four bolts under the seat was missing, and that there was evidence of wear on a tag under the seat where one of the bolts was loose before the accident. He concluded that improper maintenance and disrepair rendered Merante's chair unable to withstand the loads placed on it during normal use. Petrella also noted that those who regularly used the chair in question should have been aware of the loose parts when they sat in the chair. However, neither Merante nor Potthast reported noticing any such problems.[4]

Finally, James Weber testified as a witness to the chair collapsing. He recalled observing nothing unusual about the way Potthast had sat in the chair.

Metro–North, in turn, focused on Potthast's lack of credibility and on the fact that Metro–North lacked any knowledge that the chair was worn or in any other way defective. Tarkington, the senior foreman, reported that Kane never advised him of the repairs to Orellana's chair, and another Armature Room foreman, Edward Hilbert, advised the court that prior to Potthast's accident, he too was not aware of any problems with any of the chairs in the Armature Room.

At the conclusion of the evidentiary stages of the trial on August 7, the court convened a conference and presented

2. Considering how a missing bolt may have been a contributing factor in the collapse of Potthast's chair, it is not insignificant to note that the necessary repairs to Orellana's chair involved the "sandwiching [of] one of the arms with two metal plates and holding the plates together with nuts and bolts."

3. According to Kane, it is a standard practice for Metro–North employees at the Harmon Shop to make their own repairs.

4. Commenting on how short a period of time Potthast had been seated in Merante's chair when it collapsed, Petrella was expressly not concerned with Potthast's inability to detect such problems.

counsel with its proposed instructions to the jury. Among Magistrate Judge Yanthis's suggested charges was an instruction that the fact that an accident had happened, standing alone, would not permit the jury to draw the inference that the accident was caused by someone's negligence. Potthast's counsel did not object to this charge.[5]

During this same conference, the court ruled that it would strike the portions of Merante's testimony related to his observations of repairs made to other chairs in the Armature Room. The court stated that it would permit neither Merante's testimony on that matter, nor the testimony of those prospective witnesses who had observed repairs but could not pinpoint the timing of those repairs, to go to the jury. Potthast's counsel objected vigorously and argued that Metro–North should not be allowed to claim that it lacked notice that the chairs in the Armature Room might be in need of repair when Metro–North promoted a "business practice that ... encourage[d its] employees to make 'home grown' repairs without giving notice to supervision." This objection was overruled.

When both parties returned the next day (August 8, 2003) for summations, Potthast's counsel requested that the court give the jury a *res ipsa loquitur* instruction.[6] Now, it was Metro–North's turn to object. Metro–North argued that "it would be prejudicial for the court to charge the jury on a new theory of liability after the close of all evidence, and without defendant having had an opportunity to

offer evidence related to the new theory of liability." Furthermore, Metro–North also claimed that Potthast, by his delay, had waived his right to make that request and that, irrespective of the timing and procedural bars, Potthast did not produce enough evidence at trial to merit that charge.

The court ruled that the *res ipsa loquitur* instruction was untimely and expressly agreed with Metro–North's contention that the defendant might have tried the case differently if Potthast had presented this theory earlier. Moreover, the court echoed Metro–North's substantive contention that, notwithstanding the timing concerns, Potthast did not meet the evidentiary standards for a *res ipsa loquitur* theory because it did not show that Metro–North had exercised "exclusive control" over the chair. But, the court did permit Potthast (over Metro–North's objection) to make a *res ipsa loquitur*-like argument in his closing statement to the jury. The jury returned within the day with a unanimous verdict for the defendant.

Immediately after the verdict was handed down, Potthast, relying exclusively on the court's denial of his request for a *res ipsa loquitur* charge, moved to set aside the jury verdict and for a new trial. Metro–North opposed the motions, and the court denied them for substantially the same reasons it gave during trial.

Potthast appealed.

## II. Discussion

On appeal, Potthast argues that, to the extent that a *res ipsa loquitur* charge sim-

---

**5.** That charge was actually made, and Potthast did not object to it then either. Under the circumstances, it would not be implausible to argue that by not objecting to a charge directly contrary to the one he requested, Potthast waived his request. Since, however, Metro–North does not raise any such waiver, we will pay no further attention to the unusu-

al fact that Potthast seems at the same time to have asked for a charge that is directly contrary to the court's—to which Potthast raised no objection.

**6.** Specifically, Maurer requested New York Pattern Jury Instruction 2:65.

ply describes a form of circumstantial evidence that allows a trier of facts to infer negligence, a plaintiff does not need to request it formally in advance of trial. Alternatively, Potthast claims that even if he were required to have disclosed to the court his intention to present a *res ipsa loquitur* theory at trial, or to request that the court charge the jury accordingly, unexpected changed circumstances arose in the course of the trial that necessitated and justified his "late" request. Moreover, Potthast challenges, as a misapplication of the law, the district court's holding that, leaving aside procedural problems with the proposed *res ipsa loquitur* charge, such a charge was substantively unwarranted.

### A. Substantive Merits of Potthast's *Res Ipsa Loquitur* Claim

We begin with the substantive challenge to the district court's rejection of Potthast's requested jury charge. If—as the district court stated—the jury charge were not warranted, independent of procedural complications, then we would not need to decide the thorny issues of proper notice, timely filings, and prejudice to the parties. On the merits, however, we believe that a *res ipsa loquitur* charge was appropriate.

■ We have said that in order to justify a *res ipsa loquitur* theory, a plaintiff must demonstrate that

(1) the event was of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it was caused by an agency or instrumentality within

the exclusive control of the defendant; and (3) it was not due to any voluntary action or contribution on the part of the plaintiff.

*Santa Maria v. Metro–North Commuter R.R.,* 81 F.3d 265, 272 (2d Cir.1996) (quoting *St. Paul Fire & Marine Ins. Co. v. City of New York,* 907 F.2d 299, 302 (2d Cir.1990)); *see also* Restatement (Second) of Torts § 328(D) (1965).[7]

■ Because the court below found Potthast's claims for a *res ipsa loquitur* charge to be lacking just with respect to the second requirement, we only need examine whether the court erred in failing to find that Metro–North exercised the requisite control over the broken chair. The court ruled that Potthast's act of sitting in the chair defeated any argument that Metro–North was in sole control and, moreover, it held that because Merante and other Metro–North employees had unfettered access to the chair in question, the presence of "third parties" negated any claim of Metro–North's exclusivity.

We do not agree in either respect. The district court applied a standard of exclusive control that is both too narrow and too rigid an interpretation of this circuit's holdings. In the first place, the district court's treatment of Metro–North workers as "third parties" represents an unsupportable departure from well-settled law that imputes the negligent actions of employees to their employers. As a result, defendant's control is by no means diminished by the presence of its employees.[8]

---

7. The meaning given to exclusive control in the cases, however, is anything but consistent with what the requirement, on its face, would seem to demand. *See Williams v. KFC Nat'l Mgmt. Co.,* 391 F.3d 411, 422, 426–27 (2d Cir.2004) (Calabresi, *J.,* concurring) (collecting cases).

8. This has been the case since early in the development of the *res ipsa loquitur* doctrine.

*See Scott v. London & St. Katherine Docks,* 3 H. & C. 596, 159 Eng. Rep. 665 (1865) ("[W]here the thing is shown to be under the management of the defendant, *or his servants,* and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care." (emphasis

Furthermore, the district court's finding that Potthast's interaction with the instrumentality of his injury precluded Metro–North's control is also unfounded. Indeed, adopting the reasoning of the court below would render superfluous essential components of the aforementioned three-pronged *res ipsa loquitur* test. Specifically, the third-prong (that the accident was not due to any voluntary action on the part of the plaintiff) of the *res ipsa loquitur* test would have little value if we were to hold that the exclusive control requirement were itself understood to mean that the plaintiff had not taken any voluntary action with respect to the instrumentality of his injury. For each prong of the test to have independent meaning, exclusive control cannot be interpreted so rigidly as to preclude all interactions between a plaintiff and an instrumentality of his or her injury. *Cf. Grajales–Romero v. American Airlines, Inc.,* 194 F.3d 288, 295 (1st Cir. 1999); *Colmenares Vivas v. Sun Alliance Ins. Co.,* 807 F.2d 1102, 1107 (1st Cir. 1986); *see also Finocchio v. Crest Hollow Club at Woodbury, Inc.,* 184 A.D.2d 491, 492–93, 584 N.Y.S.2d 201 (N.Y.App.Div., 2d Dep't, 1992) (concluding that the fact "[t]hat the Plaintiff had temporary possession of the chair [did] not negate the inference that its sudden collapse, under normal usage, was most likely caused by the defendant's negligence"). It is not surprising then, that the "requirement" of exclusive control has not been read so strictly in our cases, by the Restatement, and by many state courts. *See Williams v. KFC Nat'l Mgmt. Co.,* 391 F.3d 411, 422,

426–27 & n. 9 (2d Cir.2004) (Calabresi, *J.,* concurring) (collecting cases).

For support, the district court relies principally on *Santa Maria,* 81 F.3d at 272, and *St. Paul,* 907 F.2d at 303. But *Santa Maria* is readily distinguishable from the case before us. *Santa Maria* involved an accident on a cot, which the railroad had set up and left in a private cubicle for the benefit of the plaintiff and other, like-situated, employees should they wish to catch a quick cat-nap. As a result, in *Santa Maria,* there were extensive times immediately before the accident when the plaintiff was in sole and unsupervised possession of the instrumentality of the accident. Because the plaintiff had unencumbered and unmonitored control over the instrumentality of his injury, we could not eliminate a significant possibility that the harm was caused by someone other than the defendant. Accordingly, we could not hold that the defendant, Metro–North, exercised sufficient control to justify a *res ipsa loquitur* inference of liability. *Santa Maria,* 81 F.3d at 272. In the case before us, Potthast never approached an analogous level of control.

Equally distinguishable is *St. Paul,* which involved questions of the applicability of a *res ipsa loquitur* charge under New York State tort law. In *St. Paul,* we affirmed the denial of such a charge due to the lack of control by the defendants. We did this because we found that there were third parties, not acting on behalf of the defendant, who had unsupervised access to

added)); *Rose v. Stephens & Condit Transp. Co.,* 11 F. 438, 438–39 (S.D.N.Y.1882) ("If the explosion resulted either from the carelessness of the employees of the defendant . . . or from the negligence of the defendant . . . it is conceded the defendant was liable."); *see also* F. Harper, F. James & O. Gray, The Law of Torts § 19.7, at 47 (2d ed.1986) (hereinafter "Harper, et al.") (noting that exclusive con-

trol requirement in the *res ipsa loquitur context* is satisfied even when defendants cede control to outside agents, provided that defendants have a nondelegable duty); W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 39, at 250–51 (5th ed.1984) (hereinafter "Prosser and Keeton") (same).

the "instrumentality that caused the injury." *St. Paul,* 907 F.2d at 303. The actions of these independent parties, as potential causes of the accident, were in no adequate way excluded. Little wonder then, that a *res ipsa loquitur* charge was deemed not justified.[9]

█ *St. Paul* and *Santa Maria.* set out two crucial obstacles to a plaintiff's meeting of *res ipsa loquitur's* control requirement. But they are obstacles that are not present in the case before us. First, unlike *Santa Maria,* Potthast was never alleged to have been alone for substantial periods of time in a private cubicle with the instrumentality of his injury. Potthast interacted with the chair that allegedly harmed him only in a common, well-trafficked workroom. As a result, based on the facts presented at trial, there is no reason to believe that Potthast had any inappropriate interaction with the instrumentality of his injury. *See, e.g.,* Testimo-ny of James Weber (Trial Transcript, 172–73). It is this consideration of *inappropriate* interaction, rather than whether there ever was or was not *any* interaction involving the plaintiff and the instrumentality of the injury, that constitutes the salient criterion. *See, e.g., Jesionowski v. Boston & M. R.R.,* 329 U.S. 452, 457, 67 S.Ct. 401, 91 L.Ed. 416 (1947) (noting that a literal interpretation of exclusive control would "bar juries from drawing an inference of negligence on account of unusual accidents in all operations where the injured person had himself participated in the operations, even though it was proved that his operations of the things under his control did not cause the accident"). Second, whereas the "third parties" in *St. Paul* worked for entities that were distinct from the *St. Paul* defendant, the individuals with access to Merante's chair in the instant case were all regular Metro–North employees.[10] Ac-

---

**9.** Conversely, in many cases, the fact that third parties had access to the instrumentality has not sufficed to preclude the issuance of a *res ipsa loquitur* jury charge so long as adequate evidence was presented that allowed a jury to exclude the actions of such third parties as significant causes of the injury. *See, e.g., Pavon v. Rudin,* 254 A.D.2d 143, 145–46, 679 N.Y.S.2d 27, 29–30 (N.Y.App. Div., 1st Dep't, 1998); *Finocchio v. Crest Hollow Club at Woodbury, Inc.,* 184 A.D.2d 491, 492, 584 N.Y.S.2d 201, 202 (N.Y.App.Div., 2d Dep't, 1992); *Nesbit v. New York City Transit Auth.,* 170 A.D.2d 92, 98, 574 N.Y.S.2d 179, 182–83 (N.Y.App. Div., 1st Dep't, 1991).

**10.** In *St. Paul,* we specifically noted that the "fact that the only specific evidence of access to the [air-conditioner's] drain valve involved someone *other than an employee* of the defendants weighs strongly against the application of *res ipsa loquitur.*" *St. Paul,* 907 F.2d at 303–04 (emphasis added); and we added that only the presence of individuals "other than ... employee[s] of the defendants" can defeat a charge of exclusive control for "[t]he purpose of the exclusive control requirement is to eliminate *within reason* the possibility that the event was caused by someone other than defendant." *Id.* at 302–03 (emphasis added); *see also Sinkler v. Missouri Pacific R.R. Co.,* 356 U.S. 326, 330, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958) (noting that "a railroad worker may recover from his employer for an injury caused in whole or in part by a fellow worker").

In addition to the district court's reliance on *Santa Maria* and *St. Paul,* the other cases that Metro–North identifies are similarly unpersuasive. In *Peyton v. St. Louis Southwestern Ry. Co.,* 962 F.2d 832 (8th Cir.1992), the Eighth Circuit upheld a district court's refusal to give a *res ipsa loquitur* charge based on insufficient showing by the plaintiff that the injury was of the sort that does not occur without negligence. In that case, the court held that using a particular tool (a "crow's foot") could cause injuries without there being any negligence. *See id.* at 834. Unlike *Peyton,* the district court in the case before us did not question whether a chair was likely to break in the absence of negligence.

Metro–North's citation to our holding in *Sojak v. Hudson Waterways Corp.,* 590 F.2d 53 (2d Cir.1978), is no more persuasive. In *Sojak,* we affirmed the district court's refusal to in-

cordingly, we do not agree with the court below that Potthast failed to establish control by Metro–North "of *sufficient* exclusivity to *fairly rule* out the chance that [the injury] was caused by some agency other than defendant's negligence." *St. Paul,* 907 F.2d at 303 (quoting *Dermatossian v. New York City Transit Auth.,* 67 N.Y.2d 219, 228, 492 N.E.2d 1200, 1205, 501 N.Y.S.2d 784, 789 (1986)) (emphasis added). Nor do we agree that there was insufficient evidence for the jury to "infer that the greater probability lies at Defendant's door." Harper, et al., *supra,* § 19.7, at 1086; *see also* Prosser and Keeton, *supra,* at 250 (noting that a lack of control will not prevent application of *res ipsa loquitur* in collapsing chair cases where the "evidence [presented] reasonably eliminates other explanations").

■ We thus find error with the district court's ruling on the merits, and we further note, and not just in passing, that in making determinations regarding the plaintiff's eligibility for a *res ipsa loquitur* charge, the court should be especially careful not to take to itself the role and responsibility of the jury. In persuading the court that a plaintiff merits a *res ipsa loquitur* instruction, the plaintiff cannot be required to meet as high an evidentiary

hurdle as would ultimately be needed to convince a jury. *See, e.g., Sweeney v. Erving,* 228 U.S. 233, 240, 33 S.Ct. 416, 57 L.Ed. 815 (1913) ("*[R]es ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference...."); *Jesionowski,* 329 U.S. at 457, 67 S.Ct. 401 ("[T]he question here really is not whether the application of the [*res ipsa loquitur*] rule relied on fits squarely into some judicial definition, rigidly construed, but whether the circumstances were such as to justify a finding that this derailment was a result of the defendant's negligence."); *cf. Knight v. Otis Elevator Co.,* 596 F.2d 84, 90–91 (3d Cir.1979) (observing that the operative question for a district court in deciding to present a *res ipsa loquitur* charge "is whether it is permissible to conclude, after excluding the conduct of the plaintiff and of third persons, that the [event causing the accident] does not usually occur unless the defendant has been negligent. We think the determination of whether the inference was to be drawn was for the jury. There was no evidence that the plaintiff contributed in any way to the accident. Although conflicting, we think the evidence sufficiently eliminated the conduct of third parties so as to re-

struct the jury on a *res ipsa loquitur* charge. We simply noted, without elaboration, that a *res ipsa loquitur* charge is warranted only "where the instrumentality that causes the harm is under the exclusive control of the defendant and the accident is of a type that in the ordinary course of events would not occur in the absence of negligence." *Id.* at 55. From this scant discussion in *Sojak,* we cannot glean any significant insights into how we apply the exclusive control standard.

Finally, Metro–North describes *Piligian v. United States,* 642 F.Supp. 193 (D.Mass.1986), and *Prickett v. United States,* 111 F.Supp.2d 1191 (M.D.Ala.2000), as two district court cases that are "factually similar to" the one before us. Both of those cases, however, are readily distinguishable. In *Piligian,* after a

bench trial, the court held that in its role as finder of facts, it could not conclude that the evidence presented sufficiently eliminated other explanations for the chair's collapse. But, as a matter of law, it declined to rule "that the doctrine of *res ipsa loquitur* ha[d] no applicability." *Piligian,* 642 F.Supp. at 197. And in *Prickett,* the district court noted that although the notion of exclusive control *should not* be interpreted literally, a *res ipsa loquitur* inference was unwarranted in light of the fact that the plaintiff did have, for hours, exclusive (and evidently unobserved) control over the mechanical "geri-chair" in question and was, as likely as the defendants, to have tinkered with the equipment, loosening parts, and precipitating its collapse. *Prickett,* 111 F.Supp.2d at 1196–97.

quire resolution by the jury."); *see also Piligian,* 642 F.Supp. at 197.

Having determined that it was error for the court to deny the *res ipsa loquitur* charge on the merits, we must turn to whether the charge itself was properly requested.

### B. Issues of Timeliness and Harmlessness

Potthast first sought a *res ipsa loquitur* jury instruction after the close of the evidentiary stages of the trial and before summations. Such an instruction was not included in his pretrial memoranda to the court, nor was it requested at any earlier time during the course of the trial.

The apparent barriers to permitting a last-minute addition to jury instructions of the kind Potthast requested—and was denied—are found in Rules 16 and 51 of the Federal Rules of Civil Procedure. In relevant parts, Rule 16(a) states that in

> any action, the court may in its discretion direct the attorneys for the parties ... to appear before it for a conference ... before trial for such purposes as (1) expediting the disposition of the action; (2) establishing early and continuing control so that the case will not be protracted because of lack of management; (3) discouraging wasteful pretrial activities; (4) improving the quality of the trial through more thorough preparation, and (5) facilitating the settlement of the case.

*See also* Fed.R.Civ.P. 16(e) ("After any conference held pursuant to this rule, an order shall be entered.... The order following a final pretrial conference shall be modified only to prevent manifest injustice."). Moreover, Fed.R.Civ.P. 51(a)(1) states that jury instructions are to be submitted at "the close of evidence or at an earlier reasonable time that the court directs." In those instances when the trial court sets an earlier deadline, Fed.R.Civ.P. 51(a)(2)(A) authorizes a party to submit additional requests at the close of evidence "on issues that could not reasonably have been anticipated at an earlier time." *See also Clark v. Pennsylvania R.R. Co.,* 328 F.2d 591, 594 (2d Cir.1964) (noting the need for trial courts to demonstrate some flexibility in amending pretrial orders and suggesting that "[o]therwise a pre-trial order or pre-trial statements would hold the parties in a vise, and the result might be just about as bad as a return to the old sporting theory of justice").

We review a trial court's decision to amend or modify a pretrial order for abuse of discretion. *See Rapco, Inc. v. Comm'r,* 85 F.3d 950, 953 (2d Cir.1996); *Dunlap–McCuller v. Riese Org.,* 980 F.2d 153, 158 (2d Cir.1992). In determining whether the court abused its discretion, we have said:

> Appropriate factors to consider include: (1) the prejudice or surprise in fact to the opposing party; (2) the ability of the party to cure the prejudice; (3) the extent of disruption of the orderly and efficient trial of the case; and (4) the bad faith or willfulness of the non-compliant party. Prejudice to the party seeking amendment or modification of the order is also relevant, as a trial court should not refuse to modify a pre-trial order where manifest injustice will result.

*Rapco,* 85 F.3d at 953 (internal citations and quotations omitted).

In addressing requests for late jury charges under Rule 16, courts have stated that the Rule "provides the district courts with a powerful mechanism to organize and expedite litigation. The pretrial conferences contemplated by the Rule create an indispensable opportunity to clarify and delimit issues to be tried and to estab-

lish a timetable for the proceedings as a whole." *Senra v. Cunningham,* 9 F.3d 168, 170 (1st Cir.1993). As a result, the district court may bar any issue that was foreseeable but not raised in a pretrial order or conference. *See id.; cf. Miller v. Brazel,* 300 F.2d 283, 287 (10th Cir.1962) (affirming a district court's decision not to submit a *res ipsa loquitur* jury instruction when that question was not included in the pretrial memoranda). Furthermore, as commentators have noted, though a

> court may permit the pretrial order to be amended when the danger of surprise or prejudice to the opposing party is small and a failure to amend might result in an injustice to the moving party.... if the evidence or issue was within the knowledge of the party seeking modification at the time of the [pretrial] conference ... then it may not be allowed.

6A Wright & Miller, Federal Practice and Procedure § 1527 (2d ed.1990).

The district court held that Potthast had had ample opportunity to pursue a *res ipsa loquitur* theory from the very beginning of the case, or at the very least, from the time his claims against the manufacturer and distributor were dismissed as a matter of law. Moreover, the court concluded that charging the jury at the end of the trial's evidentiary phases would have significantly prejudiced Metro–North. Finally, the court found that Potthast had no adequate reason for requesting this jury charge so late in the process.

In truth, if the court below were to have allowed Potthast's eleventh-hour request, we very much doubt that Metro–North would have been appreciably prejudiced by the delay. In its reply brief, Metro–North indicated that, had it been given notice, it would have raised three sets of defenses to a *res ipsa loquitur* theory; but none of the supplied reasoning, even if elaborated upon in a trial setting, is remotely compelling.

■ First, Metro–North stated that it would have presented evidence that, in addition to the Metro–North employees, independent contractors also had access to the Armature Room. Given that a defendant cannot disclaim responsibility by contracting out non-delegable duties, the introduction of independent contractors in lieu of employees does not change the calculus for evaluating *res ipsa loquitur* claims involving exclusive control. *See Sinkler,* 356 U.S. at 331–332, 78 S.Ct. 758 (holding "that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of § 1 of FELA").

Second, Metro–North indicated that it would have tried to "develop the theory that the accident may have been caused by the heavy-set plaintiff having leaned back in the chair in an awkward, dangerous way." But since Metro–North did not take any steps to refute the testimony of eyewitness Weber, who recounted that Potthast had done nothing wrong or extraordinary in sitting in the chair, and since the record before us reveals that Potthast weighed only 5 or 10 pounds more than Merante, the usual occupant of the chair, there is little reason to think that Metro–North could have marshaled any more evidence if given notice of Potthast's intent to seek a *res ipsa loquitur* charge.[11]

---

11. In the context of this argument, Metro–North argues that the "jury might well have been very receptive to aggressive theories

blaming plaintiff for the accident or even for the fact that the missing bolt was never found." However, given Metro–North's tac-

Third, Metro–North insists that had it known of Potthast's request for a *res ipsa loquitur* charge, it would have been more diligent in finding the missing bolt, and perhaps seeking to prove that there indeed was a defect. Yet even without the prospect of a *res ipsa loquitur* charge on the horizon, every incentive imaginable—within the context of a negligence defense—already existed for Metro–North, if it could, to try to locate that bolt and to demonstrate that the chair suffered from a manufacturer's defect.

■ Accordingly, we find that Potthast's late request, if granted, would have caused Metro–North minimal prejudice, and therefore we need not address whether such prejudice could have been readily cured or whether allowing the late charge would have been disrupting to the management of the trial. Instead, we turn directly to whether the district court's decision to deny the charge prejudiced Potthast and, if so, whether manifest injustice resulted. *See* Fed.R.Civ.P. 51(a); *Rapco*, 85 F.3d at 953.

Potthast claims that he was surprised when the court struck key portions of Merante's testimony at the close of the evidentiary stages of the trial. The evidence Potthast wanted the court to admit related specifically to Merante's recollections and observations regarding repairs made to chairs in the Armature Room. As indicated above, the court refused to allow the testimony because Merante could not recall

whether the repairs occurred before or after Potthast's accident. The alleged prejudice to Potthast resulted when, despite this evidentiary ruling, the court refused Potthast's request for a *res ipsa loquitur* charge.

Potthast's purported prejudice, if any, does not rise to the level of injustice. Potthast had little reason to be surprised that the portions of Merante's testimony that related to the other repairs would be suppressed. The district court had effectively put Potthast on notice that it would probably strike Merante's testimony when, earlier, it had refused to allow similar testimony by three other Metro–North employees because they, like Merante, could not recall when the repairs were made relative to Potthast's accident. And, the likelihood of the court precluding Merante's testimony was made even clearer to the parties when Judge Yanthis expressly stated, again before trial, that it "would want to hear [Merante] outside the presence of the jury testifying initially as to this issue of whether or not, what he's going to testify about, happened before or after the plaintiff's accident, so I'm going to reserve on that." Under the circumstances, it is difficult to imagine how Potthast was in any way caught off-guard by the supposed last-minute exclusion of Merante's testimony. The exclusion should have been reasonably anticipated, and counsel had ample opportunities before the start of trial to propose a *res ipsa loquitur* theory, as an alternative way of showing negligence.[12]

tics at trial and its focus on the credibility—or lack thereof—of Potthast and his witnesses, it is difficult to believe that Metro–North would have spent much more time emphasizing those points, if faced with the prospect of opposing a potential *res ipsa loquitur* charge.

**12.** We of course express no view on the correctness of the court's exclusion of Merante's and others' similar testimony since Potthast has not appealed these decisions. We note

only that in many respects, Metro–North was in a better position to assign or confirm the exact dates of Merante's recollections, as well as those of the other prospective witnesses. The simple fact that Metro–North, a large, sophisticated operation, did not have records of any of the repairs to chairs in the Armature Room is troubling. If such records existed, they could have been used to clarify the witnesses' recollections; or—if they demonstrated that the repairs happened after Potthast's

Moreover, to the extent that Rules 16 and 51 give district courts the authority to organize trials in efficient ways and that the court below was in no way unreasonable in requesting pretrial memoranda two weeks prior to the start of the trial, Potthast bears responsibility—independent of the court's evidentiary rulings—for failing to anticipate the utility, if not the necessity, of proffering what is certainly a nonfrivolous *res ipsa loquitur* theory of liability as an additional or alternative way of demonstrating defendant's alleged negligence. Even if the district court had admitted Merante's testimony, the usefulness of the *res ipsa loquitur* theory should have been evident, at least from the moment the court eliminated the possibility of liability on the part of the chair's manufacturers and distributors.

Finally, it is important to note that the court did allow Potthast, in his closing statement, to make a *res ipsa loquitur*-like argument. Specifically, counsel was permitted to say to the jury:

> Is this the kind of accident that you would expect in your own life experience to happen without there being negligence? ... This chair was in the exclusive control of the Railroad. It sat in an armature room with nine other identical chairs and was used exclusively in there by Railroad employees. In your life experience, do chairs snap and break like this because there's no negligence at all, where there's no evidence of any design or manufacturing defect? ...

There was no evidence that the plaintiff did anything wrong that contributed.

We, of course, do not equate such statements made by an advocate with those made in a court's formal, impartial instructions to the jury.[13] *Cf. Grajales–Romero*, 194 F.3d at 295, 296 n. 8 ("[J]urors who can draw the inference of negligence even without a res ipsa loquitur instruction should be permitted to do so.... [But, b]y affirming that a jury may find res ipsa loquitur without a specific instruction, we do not imply that a trial judge should withhold such an instruction on the grounds that circumstantial evidence and inference instructions are adequate."). Nevertheless, we do note that any prejudice that Potthast may have suffered as a result of the court's refusal to give the jury a *res ipsa loquitur* instruction—though not eliminated—was at least diminished by Potthast's being allowed to raise *res ipsa loquitur*-type arguments in his summation. And this fact is relevant to whether manifest injustice resulted from the court's decision.

## III. Conclusion

 While we reaffirm the need for district courts to allow flexibility in allowing revisions to pretrial submissions, *see Clark*, 328 F.2d at 594, no such revision was manifestly warranted in this case. Potthast had ample opportunities and incentives to request a *res ipsa loquitur* charge long before he did. Additionally,

injury—to undermine the relevance of the testimony of all the prospective witnesses. (The alternative assumption—that records existed and that those records indicated repairs occurred prior to Potthast's injury—would of course paint the defendant in an infinitely worse light.) Whether Metro–North's position as the obvious record-keeper would have justified admission of the testimony in order to give Metro–North an incentive to introduce such records, or, if none existed, to maintain

them in the future, is not for us to say in this case.

13. The difference is, of course, aggravated by the fact that the court instructed the jury that the "mere fact that an accident happened, standing alone, does not permit you to draw the inference that the accident was caused by someone's negligence." But, as noted earlier, no objection was made to that charge.

the court ultimately allowed Potthast to make a *res ipsa loquitur*-like argument to the jury. Although we acknowledge that Potthast had a right to a (timely requested) *res ipsa loquitur* charge, and that he was arguably prejudiced by the court's decision not to issue such a charge, we cannot conclude that he suffered manifest injustice, or anything approximating it by the absence of the charge in this case. Accordingly, we hold that the district court did not abuse its discretion in refusing to submit a *res ipsa loquitur* charge to the jury, and we AFFIRM its judgment.

KEARSE, Circuit Judge, concurring.

I concur in the affirmance of the judgment of the district court for the reasons stated in Parts I and II.B. of the majority opinion.